UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------- X

NYP Holdings, Inc.,

                 Plaintiff,

         - against -

NEW YORK POST PUBLISHING INC.,
STEVEN JUDE HOFFENBERG, and JANE
DOES 1-10,

               Defendants.

------------------------------------------------------- X

14 Civ. 8310

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ORDER TO SHOW CAUSE FOR
## PRELIMINARY INJUNCTION AND EXPEDITED PROCEEDINGS

**DAVIS WRIGHT TREMAINE LLP**
**1633 Broadway**
**New York, New York 10019**
**(212) 489-8230**
*Attorneys for NYP Holdings, Inc.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

   A.     NYP Holdings' Trademarks and Goods/Services ........................................................ 2

   B.     The Infringing Website ................................................................................................ 3

   C.     Hoffenberg and the Corporation ................................................................................. 5

   D.     Defendants' Campaign to Deliberately Mislead the Public .......................................... 6

   E.     NYP Holdings Attempts to Halt Defendants' Unlawful Acts ....................................... 7

ARGUMENT .............................................................................................................................. 8

   I.     NYP HOLDINGS IS ENTITLED TO A PRELIMINARY INJUNCTION
        ENJOINING DEFENDANTS' ILLEGAL ACTS ................................................... 8

        A.     NYP Holdings is Likely to Prevail on Its Claims for Trademark
              Infringement ................................................................................................... 9

             1.     The NEW YORK POST Marks Are Valid And Protectable ................ 9

             2.     Defendants Have No Trademark Rights in the Name "New York
                  Post Publishing Inc." ......................................................................... 10

             3.     Consumers Are Likely To Be Confused About the Source,
                  Sponsorship, and Affiliation of Defendants' Website and News
                  Stories ............................................................................................... 13

                  a.     NYP Holdings' Marks are Strong, Valid, and Protectable ..... 13

                  b.     Defendants' Purported Mark Is Identical and/or
                       Confusingly Similar to the NEW YORK POST Marks .......... 14

                    c.     The Parties Goods/Services Are Identical .............................. 15

                    d.     Actual Confusion .................................................................... 16

                    e.     Defendants Adopted and Used the Mark in Bad Faith ........... 16

                    f.     Defendants' Products/Services Are of Inferior Quality .......... 17

                    g.     Consumer Sophistication ........................................................ 18

i

B.     NYP Holdings Will Likely Prevail on its Anticybersquatting Consumer Protection Act Claims ................................................................................19

    1.     The NEW YORK POST Marks Are Distinctive and Famous............19

    2.     The Infringing Domain Name Is Identical and/or Confusingly Similar to the NEW YORK POST Marks.........................................20

    3.     Defendants Have Bad-Faith Intent to Profit from the NEW YORK POST Marks....................................................................................20

C.     Injunctive Relief is Necessary to Prevent Irreparable Harm...........................21

D.     NYP Holdings Has Inadequate Remedies at Law, and the Balance of Hardships and Public Interest Favor an Injunction.........................................23

E.     There is a Fair Ground for Litigation and the Balance of Hardships Tips Decidedly in NYP Holdings' Favor...............................................................24

CONCLUSION ..............................................................................................................25

DWT 24928526v6 3930033-000043

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*,
  470 F.2d 689 (2d Cir. 1972) ............................................................................................ 15

*Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*,
  No. 04 Civ. 6107, 2006 WL 2289847 (S.D.N.Y. Aug. 8, 2006) ........................................ 19

*Am. Express Co. v. Am. Express Limousine Serv.*,
  772 F. Supp. 729 (E.D.N.Y. 1991) .................................................................................. 15

*American Automobile Association v. AAA Insurance Agency, Inc.*,
  618 F. Supp. 787 (W.D. Tex. 1985).................................................................................. 11

*Artisan Mfg. Corp. v. All Granite & Marble Corp.*,
  559 F. Supp. 2d 442 (S.D.N.Y. 2008)................................................................................ 16

*Banff, Ltd. v. Federated Dep't Stores Inc.*,
  841 F.2d 486 (2d Cir. 1988) ....................................................................................... 9, 13

*Bel Canto Design, Ltd. v. MSS Hifi, Inc.*,
  837 F. Supp. 2d 208 (S.D.N.Y. 2011)................................................................................ 22

*Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc.*,
  253 F.2d 431 (C.C.P.A. 1958)........................................................................................... 15

*by Bristol-Myers Squib, Co. v. McNeill-P.P.C., Inc.*,
  973 F.2d 1033 (2d Cir. 1992) ........................................................................................... 18

*Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.*,
  No. 95 Civ. 4008 (AGS), 1995 WL 528001 (S.D.N.Y. Sept. 6, 1995) .............................. 14

*Christian Dior, S.A.R.L. v. Miss Dior of Flatbush, Inc.*,
  No. 70-C-1471, 1972 WL 18024 (E.D.N.Y. March 15, 1972).............................................. 11

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*,
  696 F.3d 206 (2d Cir. 2012) ......................................................................................... 8, 24

*Clinique Labs., Inc. v DEP Corp.*,
  945 F. Supp. 547 (S.D.N.Y. 1996).............................................................................. 14, 15

*Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of N.Y.*,
  423 F. Supp. 975 (E.D.N.Y. 1976) .............................................................................. 10, 11

iii

*Colonial Radio Corp. v. Colonial Television Corp.*,
    78 F. Supp. 546 (S.D.N.Y. 1948) ........................................................................................ 24

*Corning Glass Works v. Jeanette Glass Co.*,
    308 F. Supp. 1321 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970) .............................. 23

*Daimler Chrysler v. The Net Inc.*,
    388 F.3d 201 (6th Cir. 2004) ............................................................................................... 20

*Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.*,
    No. 01 Civ.2950, 2005 WL 2148925 (S.D.N.Y. Sept. 6, 2005)........................................... 19

*eBay Inc. v. MercExchange*, LLC,
    547 U.S. 388 (2006)..................................................................................................... 8, 24

*The George Washington Mint, Inc. v. The Washington Mint, Inc.*,
    349 F. Supp. 255 (S.D.N.Y. 1972)....................................................................................... 11

*GTFM v. Solid Clothing*,
    215 F. Supp. 2d 273 (S.D.N.Y. 2002).................................................................................. 18

*Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*,
    281 F.2d 755 (2d Cir. 1960) .......................................................................................... 10, 16

*ITC Ltd. v. Punchgini, Inc.*,
    482 F. 3d 135 (2d Cir. 2007) ............................................................................................... 10

*Jahr USA Publ'g v. Meredith Corp.*,
    991 F.2d 1072 (2d Cir. 1993) ................................................................................................ 9

*Jefferson Bankshares, Inc. v. Jefferson Savings Bank*,
    CIV. A. No. 89-0022-C, 1989 WL 222446 (W.D. Va. Nov. 27, 1989)................................. 12

*Jews for Jesus v. Brodsky*,
    993 F. Supp. 282 (D.N.J. 1998)........................................................................................... 24

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*,
    495 F.2d 1265 (2d Cir. 1974) .............................................................................................. 10

*Lois Sportswear USA, v. Levi Strauss & Co.*,
    799 F.2d 867 (2d Cir. 1986) ................................................................................................ 16

*Lucas Nursery & Landscaping, Inc. v. Grosse*,
    359 F.3d 806 (6th Cir. 2004) ............................................................................................... 19

*Malletier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2d Cir. 2005) ................................................................................................ 14

iv

*Marks Org., Inc. v. Joles*,
   784 F. Supp. 2d 322 (S.D.N.Y.2011)...................................................................................22

*Mattel, Inc. v. Internet Dimensions, Inc.*,
   No. 99 Civ. 10066, 2000 WL 973745 (S.D.N.Y. July 13, 2000) ......................................20

*McGregor-Doniger Inc. v. Drizzle Inc.*,
   599 F.2d 1126 (2d Cir.1979)...............................................................................................18

*MetLife, Inc. v. Metro. Nat'l Bank*,
   388 F. Supp. 2d 223 (S.D.N.Y. 2005)..................................................................................18

*MGM-Pathe Commc'ns Co. v. Pink Panther Patrol*,
   774 F. Supp. 869 (S.D.N.Y.1991) .......................................................................................16

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
   818 F.2d 254 (2d Cir.1987).................................................................................................13

*Modular Cinemas of Am., Inc. v. Mini Cinemas Corp.*,
   348 F. Supp. 578 (S.D.N.Y. 1972)......................................................................................10

*The Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*,
   182 F.3d 133 (2d Cir. 1999) ...............................................................................................18

*National Customer Engineering Inc. v. Lockheed Martin Corp.*,
   No. CV 96-8938 DDP, 1997 WL 363970 (C.D. Cal. Feb. 14, 1997)...................................12

*New York City Triathlon, LLC, v. NYC Triathalon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010)...................................................................8, 14, 21, 22

*Omega Importing Corp. v. Petri-Kine Camera Co.*,
   451 F.2d 1190 (2d Cir. 1971) ........................................................................................21, 23

*Omega S.A. v. Omega Engineering, Inc.*,
   228 F. Supp. 2d 112 (D. Conn. 2002)..................................................................................20

*Opticians Ass'n of Am. v. Independent Opticians of Am.*,
   920 F.2d 187 (3d Cir. 1990) ...............................................................................................24

*Otokoyama Co. v. Wine of Japan Import, Inc.*,
   175 F.3d 266 (2d Cir. 1999) .................................................................................................9

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
   86 F. Supp. 2d 305 (S.D.N.Y., 2000)..............................................................................14, 20

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
   317 F.3d 209 (2d Cir. 2003) ...............................................................................................18

*Pfizer Inc. v. Sachs*,
   652 F. Supp. 2d 512 (S.D.N.Y.2009) ................................................................................ 16, 18

*Polaroid Corp. v. Polarad Electronics Corp.*,
   287 F.2d 492 (2d Cir. 1961) .......................................................................... 13, 15, 16, 18

*Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*,
   754 F.2d 91 (2d Cir. 1985) ........................................................................................................ 21

*ProFitness Phys. Therapy Ctr. v. Pro–Fit Ortho. & Sports Phys. Therapy P.C.*,
   314 F.3d 62 (2d Cir. 2002) ........................................................................................................ 24

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*
   813 F. Supp. 2d 489 (S.D.N.Y. 2011) .................................................................................. 18

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990) .................................................................................................... 21

*Rodgers v. Wright*,
   544 F. Supp. 2d 302 (S.D.N.Y. 2008) ................................................................................ 15

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) .................................................................................................... 8, 24

*Sengoku Works v. RMC Int'l*,
   96 F.3d 1217 (9th Cir. 1996) .................................................................................................. 10

*Spear, Leeds, & Kellogg v. Rosado*,
   122 F. Supp. 2d 403 (S.D.N.Y. 2000) *aff'd*, 242 F.3d 368 (2d Cir. 2000) ............................ 20

*Star Indus, v. Bacardi & Co.*,
   412 F.3d 373 (2d Cir. 2005) .................................................................................................... 16

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009) ...................................................................................................... 16

*Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*,
   823 F. Supp. 1077 (S.D.N.Y.1993) ........................................................................................ 16

*T. Anthony, Ltd. v. Malletier*,
   No. 93 Civ. 6900 (KC),1993 WL 659682 (S.D.N.Y. Nov. 24, 1993) ...................................... 14

*TECNIMED Srl v. Kidz–med Inc.*,
   763 F. Supp. 2d 395 (S.D.N.Y. 2011) .................................................................................. 23

*United States Polo Ass'n v. PRL USA Holdings*,
   800 F.Supp.2d 515, 541 (S.D.N.Y. 2011) ...................................................................... 21, 23

*United We Stand America, Inc. v. United We Stand, America New York*,
128 F.3d 86 (2d Cir. 1997) ............................................................................................ 10, 11

*W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*,
984 F.2d 567, 25 U.S.P.Q.2d 1593 (2d Cir. 1993) ................................................................ 18

*Wal-Mart Stores, Inc. v. Samara Bros, Inc.*,
529 U.S. 205 (2000) .......................................................................................................... 13

*Web-Adviso v. Trump*,
927 F. Supp. 2d at 44 ................................................................................................... 17, 20

**STATUTES**

15 U.S.C. § 1057(b) ................................................................................................... 10, 13

15 U.S.C. § 1058 ................................................................................................................ 10

15 U.S.C. § 1065 ............................................................................................................ 3, 13

15 U.S.C. § 1115 ................................................................................................................ 14

15 U.S.C. § 1115(b) ........................................................................................................... 20

15 U.S.C. § 1125(d) ............................................................................................................. 9

15 U.S.C. § 1125(d)(1)(A) ................................................................................................. 19

15 U.S.C. § 1125(d)(1)(B)(i) ............................................................................................. 20

15 U.S.C. § 1125(d)(1)(C) ................................................................................................. 19

**RULES**

Fed. R. Civ. P. 65 ................................................................................................................. 1

**OTHER AUTHORITIES**

145 Cong. Rec. S10,515 ..................................................................................................... 21

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
(4th ed. 2014) ............................................................................................................. 10, 12

3 Louis Altman, *Callmann on Unfair Competition, Trademarks and Monopolies*
(4th ed. 2014) .................................................................................................................... 12

DWT 24928526v6 3930033-000043

Plaintiff NYP Holdings, Inc. ("NYP Holdings" or "Plaintiff") submits this Memorandum of Law in Support of its Order to Show Cause for Preliminary Injunction and Expedited Proceedings. NYP Holdings seeks an order, pursuant to Fed. R. Civ. P. 65, to enjoin defendants New York Post Publishing Inc., Steven Jude Hoffenberg, and Jane Does 1-10 (collectively, "Defendants") from infringing NYP Holdings' famous trademarks, including NEW YORK POST and related design marks.[1]

## PRELIMINARY STATEMENT

NYP Holdings publishes the famous newspaper the *New York Post* (the "*Post*"). NYP Holdings and its predecessors have published newspapers under the NEW YORK POST Marks since at least as early as 1934, and a news website at www.nypost.com since 1996. As a result of the *Post's* unique journalistic style and NYP Holdings' tremendous investment in its brand, the NEW YORK POST Marks have become famous in the United States and throughout the world.

Steven Hoffenberg, who served a three-month stint in 1993 as the publisher of the *New York Post* before going to federal prison for sixteen years for fraud, has launched a competing news website at www.newyorkpostpublishinginc.com that deliberately infringes on the NEW YORK POST Marks. Attempting to capitalize on a brief episode in the *Post's* history, Hoffenberg perpetrates a new fraud: He claims he has the right to use the name "New York Post Publishing Inc." on competing goods and services because he incorporated a shell corporation by that name in 1993, only to let its incorporation lapse for nineteen years before reviving it after his release from prison. But this ploy to hijack the NEW YORK POST Marks has no basis in the law or fact. Trademark rights derive from use in commerce, not incorporation of a business entity under a certain name. Through decades of exclusive, widespread, and continuous use of

---

[1] NYP Holdings' registered and common-law trademarks, hereinafter collectively referred to as the "NEW YORK POST Marks," are set forth in the Declaration of Eugenie Gavenchak ("Gavenchak Decl."), dated October 15, 2014, ¶ 6, Ex. A.

1

the NEW YORK POST Marks in commerce, NYP Holdings has attained unassailable ownership of the NEW YORK POST Marks and is entitled to prevent Hoffenberg and his corporation from using them on competing goods and services.

Defendants have made clear that, unless restrained, they will continue to infringe NYP Holdings' trademarks and will broaden that infringement by publishing a competing print newspaper under the "New York Post Publishing Inc." name and licensing other newspapers to publish under that name as well. Defendants' infringement deprives NYP Holdings of control over its brand and threatens to damage the *New York Post*'s reputation and goodwill with the reading public, causing irreparable harm that cannot be remedied through money damages. An injunction restraining Defendants' unlawful behavior therefore is warranted.

## STATEMENT OF FACTS

**A.   NYP Holdings' Trademarks and Goods/Services**

The *New York Post* is the oldest, continuously published daily newspaper in the United States, having been first published by Alexander Hamilton in 1801.[2]  Today, the *Post* is sold in many states in the United States, both at newsstands and by subscription.  The *New York Post* began publishing news on the web in 1996 and has done so continuously since then.[3]  The *Post*'s website, www.nypost.com ("NYPost.com"), is one of the largest newspaper websites in the United States with approximately 98 million page views per month.  NYPost.com is accessed by users in many countries throughout the world.[4]

NYP Holdings, the publisher of the *New York Post*, is the sole and exclusive owner of a number of United States registered trademarks for its goods and services, including NEW YORK POST for daily newspapers, online newspapers, and news delivered to mobile devices, as well as

---

[2] Gavenchak Decl. ¶ 4.
[3] *Id.* ¶¶ 5, 8.
[4] *Id.* ¶ 5.

ancillary goods and services such as non-fiction books, tee-shirts, and mugs (collectively, the "NEW YORK POST Marks"). Seven of the NEW YORK POST Marks have become incontestable under 15 U.S.C. §1065.[5] NYP Holdings and its predecessors have continuously used the NEW YORK POST Marks or predecessor marks in connection with the *New York Post*'s publishing activities since at least 1934.[6]

NYP Holdings has spent hundreds of millions of dollars producing the *New York Post*, including significant amounts on advertising and promotion of the newspaper, website, and the related NEW YORK POST Marks throughout United States in a variety of media.[7] As a result of these activities, as well as NYP Holdings' widespread, exclusive, and continuous use of the NEW YORK POST marks, NYP Holdings has generated enormous goodwill in the *New York Post* name, and the NEW YORK POST Marks have become famous.[8]

### B.    The Infringing Website

Since approximately September 15, 2014, Defendants have been operating a website at www.newyorkpostpublishinginc.com (the "Infringing Website").[9] The Infringing Website's homepage features the mark NEW YORK POST at the very top of the page, functioning as a masthead for the Infringing Website. The words "New York Post" appear in large white block letters over a black background, followed by "Publishing Inc." in smaller, dark purple, script letters:

---

[5] *Id.* ¶¶ 6-7, 9, Ex. A, B.
[6] *Id.* ¶ 8.
[7] *Id.* ¶ 12.
[8] *Id.* ¶¶ 11-13.
[9] The Infringing Website was registered on of September 13, 2014. The owner of record for the domain name is "Domain Privacy Service FBO Registrant" (Gavenchak Decl., Ex. M)—a privacy service designed to hide the identity of the beneficial owner, who Plaintiff believes to be one or more of Defendants New York Post Publishing Inc., Hoffenberg, and/or Jane Does 1-10.



The Infringing Website's homepage has a layout, font style, and overall look-and-feel that resemble the trade dress and visual appearance of NYPost.com's homepage:



The Infringing Website's home page features current news headlines that link to news content elsewhere on the website; a photo of a *New York Post* cover from 1993 reading "Hoffenberg Saves the Post"; a banner reading "The Future of the New York Post"; a link to a "History of the New York Post"; and a menu of sections including "News," "Entertainment," "Opinions," "Metro," "Fashion," "Sports," and "Liz Smith," a well-known, former gossip columnist for the *New York Post*, who now writes a daily syndicated column.[10]

Like the homepage, the pages for each news story on the Infringing Website have the mark NEW YORK POST emblazoned at the top of the page. Each of the story pages also

---

[10] Gavenchak Decl. ¶¶ 31-32, Ex. N.

DWT 24928526v6 3930033-000043

includes the same photo of a 1993 *New York Post* cover and a link to a "History of the New York Post." These pages, like the homepage, have a layout, font style, and overall look-and-feel that resemble the trade dress and visual appearance of pages on NYPost.com.[11]

On October 6, Defendants announced their plan to distribute competing print newspapers in the United States under the "New York Post Publishing Inc." name, starting "this October." An article on the Infringing Website states: "Businessman mogul Steven J. Hoffenberg, CEO/Publisher New York Post Publishing Inc. has announced that the newspaper, which is currently online will expand to newsstands free of charge." The article explains that Hoffenberg will "partner[] with other free newspapers, licensing them the New York Post Publishing Inc. title." It boasts that this will make New York Post Publishing Inc. "the number one newspaper in America."[12]

Defendants also maintain a website, Post All Star News, which publishes similar content, displays the same photo of the *New York Post* cover from 1993, reading "Hoffenberg Saves the Post," and bears the legend at the bottom "Steven J. Hoffenberg, CEO New York Post Publishing Inc., licensed to POSTALLSTARNEWS.COM."[13]

## C. Hoffenberg and the Corporation

Hoffenberg is attempting to exploit his three-month connection with the *Post* more than twenty years ago to deceive readers and advertisers into believing that he, not NYP Holdings, is the true owner of the *Post* and its trademarks. Hoffenberg was the *Post*'s publisher from January to March 1993 and attempted to buy the *New York Post* from its then-owner, Peter Kalikow (who had declared bankruptcy). Hoffenberg was unable to complete the purchase because the SEC filed a civil suit against him and his company Towers Financial Corporation, which resulted in the freezing of Towers' assets. Instead, another investor, Abraham Hirschfeld, briefly took over management of

---

[11] *Id.* ¶ 33, Ex. N.
[12] *Id.* ¶ 44, Ex. Q.
[13] *Id.* ¶ 37.

5

the *Post*, which was ultimately transferred in October 1993 to its current owner, NYP Holdings.[14]

During his momentary tenure at the *Post* and for unknown reasons, Hoffenberg created a Delaware corporation called New York Post Publishing Inc. (the "Corporation").[15] Two years later, on March 1, 1995, the Delaware Secretary of State voided the Corporation's Certificate of Incorporation under Delaware Corporation Law § 502, apparently for failure to file its annual franchise tax report and pay the franchise tax due.[16] In 1997, Hoffenberg was sentenced by Judge Robert Sweet to 20 years in prison for defrauding the investors in Towers. Mr. Hoffenberg was ordered to pay $476 million in restitution to the investors. Mr. Hoffenberg was released from prison in October 2013.[17]

Between 1995 and June 2014, the Corporation was dormant. After his release from prison, Hoffenberg filed a Certificate of Renewal with the Delaware Secretary of State on June 12, 2014 to bring the defunct Corporation back into good standing.[18] To the best of NYP Holdings' knowledge, the Corporation never offered goods or services in commerce until the Infringing Website was published in September 2014.[19]

**D.   Defendants' Campaign to Deliberately Mislead the Public**

Besides publishing the Infringing Website, Defendants have taken steps to deliberately confuse readers and advertisers about Hoffenberg's relationship to the *Post* and the ownership of the NEW YORK POST Marks. For example, the Infringing Website states: "All of the assets inclusive of the trademarks and the website, New York Post, which receives 78 million hits per day, are rightfully owned by Steven Hoffenberg and TowersInvestors.com, not Rupert Murdoch." There is no basis for the false statement that anyone other than NYP Holdings owns

---

[14] *Id.* ¶ 14, Ex. C.
[15] *Id.* ¶ 15, Ex. D.
[16] *Id.*
[17] *Id.* ¶¶ 16, 17, Exs. E, F.
[18] *Id.* ¶ 18, Ex. D.
[19] *Id.* ¶ 40.

DWT 24928526v6 3930033-000043

the *New York Post*, NYPost.com, and the NEW YORK POST Marks.[20]  In addition, Defendants published an August 25, 2014 press release titled "Business Man Steven J. Hoffenberg to Once Again Publish the New York Post Publishing Inc."  The press release states repeatedly that Defendant Hoffenberg will "once again publish the New York Post Publishing Inc." (emphasis added).  It claims falsely that "[a]lthough he has spent a number of years away from the newspaper, his return is a welcomed one by many vital persons involved with NewsCorp."[21]

**E.     NYP Holdings Attempts to Halt Defendants' Unlawful Acts**

In June 2014, a lawyer purporting to represent Hoffenberg contacted in-house counsel for NYP Holdings, stating that Hoffenberg was planning to use the name New York Post Publishing Inc. and advising in-house counsel that process could be served on the lawyer.[22]  Counsel for NYP Holdings wrote to the lawyer, copying Hoffenberg, warning them that Hoffenberg had no rights in the *Post*'s name or trademarks and that "any imaginable use in commerce [of the New York Post Publishing Inc. name] would infringe NYP Holdings' intellectual property rights, and NYP Holdings will not hesitate to take legal action against your client to defend its rights."[23]  Hoffenberg's response provided no substantive justification for his prospective use of the NEW YORK POST Marks, and he later left a phone message with a News Corporation secretary stating that he "wants to start printing the NY Post again."[24]

On September 16, 2014, NYP Holdings discovered the Infringing Website.  The following day, outside counsel for NYP Holdings sent a letter to the Infringing Website's hosting service and domain registrar demanding that it withdraw its services from the Infringing

---

[20] *Id.* ¶ 35, Ex. P.
[21] *Id.* ¶¶ 25-27, Ex. K.
[22] *Id.* ¶ 19.
[23] *Id.* ¶ 20, Ex. G.
[24] *Id.* ¶ 23-24, Ex. J.

7

Website.[25]   The hosting service and registrar temporarily disabled the Infringing Website and domain name on or about September 18, 2014, but Defendants were able to get the website reactivated, and the website remains active.[26]   Since then, Hoffenberg has repeatedly communicated to in-house and outside counsel for NYP Holding that he intends to continue using the NEW YORK POST Marks, and he has threatened NYP Holdings and its lawyers with legal action for trying to enforce NYP Holdings' rights.[27]

## ARGUMENT

### I.
### NYP HOLDINGS IS ENTITLED TO
### A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS

NYP Holdings seeks a preliminary injunction barring Defendants from using its NEW YORK POST Marks in commerce and/or in their domain names.   To obtain a preliminary injunction, a party must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[28]   Although the Second Circuit has not yet addressed the matter, since the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC,*[29] courts in this district have applied the Second Circuit's standard for copyright cases[30] to trademark cases as well.[31]   Under this formulation, to obtain a preliminary injunction a plaintiff must show:  (i) a likelihood of success on the merits; (ii) that the plaintiff will suffer irreparable injury in the absence of an injunction; (iii) that the remedies at law are inadequate to compensate for the injury; (iv) that the

---

[25] *Id.* ¶ 41; Handman Decl., Ex. A.
[26] Gavenchak Decl. ¶ 42.
[27] *Id.* ¶ 43; Handman Decl., Ex. B.
[28] *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012).
[29] 547 U.S. 388, 393 (2006).
[30] *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010).
[31] *See, e.g., New York City Triathlon, LLC, v. NYC Triathalon Club, Inc.*, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010).

DWT 24928526v6 3930033-000043

balance of hardships tips in the plaintiff's favor; and (v) that the public interest will not be disserved by the issuance of a preliminary injunction.[32]

Under either standard, an injunction should issue in this case. As demonstrated in Parts A and B, *infra*, Defendants' unlawful actions infringe NYP Holdings' trademarks and violate the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).[33]   As demonstrated in Part C, *infra*, with each continued day of its use, the Infringing Website causes NYP Holdings' irreparable harm and will continue to do so unless restrained.  As demonstrated in Part D, *infra*, NYP Holdings has inadequate remedies at law, and the balance of hardships and public interest favor granting an injunction.

**A.    NYP Holdings is Likely to Prevail on Its Claims for Trademark Infringement**

To prevail on its trademark infringement claim, NYP Holdings must prove (1) the NEW YORK POST Marks are entitled to protection; and (2) there is a likelihood of confusion as to the source, sponsorship, and/or affiliation of Defendants' website and news stories.[34]

**1.    The NEW YORK POST Marks Are Valid And Protectable**

NYP Holdings is the owner of all right, title, and interest in and to the NEW YORK POST Marks in connection with daily newspapers and online news websites—the very goods and services that Defendants provide and have announced an intention to provide.[35]  The NEW YORK POST Marks are the subject of multiple federal registrations, many of which are incontestable.[36]  These registrations are *prima facie* evidence of the validity of the NEW YORK POST Marks, as well as NYP Holdings' exclusive right to use its NEW YORK POST Marks in

---

[32] *Id.*

[33] Although Plaintiff asserts additional federal and state claims in its Complaint, this motion is limited to the federal trademark claim and ACPA claim for the sake of brevity.

[34] *See, e.g., Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993); *Banff, Ltd. v. Federated Dep't Stores Inc.*, 841 F.2d 486, 489-90 (2d Cir. 1988).

[35] Gavenchak Decl. ¶¶ 6, 30-33, 44.

[36] *Id.* ¶¶ 6-9, Exs. A, B.

9

connection with daily newspapers and online news.[37] In addition, NYP Holdings has developed common-law trademark rights in the NEW YORK POST Marks through continuous and exclusive use of those marks in its news publishing business, achieving secondary meaning decades ago.[38]

## 2. Defendants Have No Trademark Rights in the Name "New York Post Publishing Inc."

Neither Hoffenberg nor his corporation ever offered any goods or services under any trademark incorporating the phrase "New York Post" prior to September 2014, and thus have developed no rights in any such mark.

The false premise at the heart of Defendants' scheme—that Hoffenberg's ownership and control of the "New York Post Publishing Inc." corporation gives Defendants a right to use that name on competing goods and services—finds no support in the law. "It is axiomatic in trademark law that the standard test of ownership is priority of use."[39] "[T]he user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially."[40] In addition to priority of use, a trademark owner must demonstrate continuous use in commerce in order to maintain its rights.[41]

Incorporating under a business name creates no trademark rights in the name because use in commerce is the basis for trademark ownership, as courts in this Circuit have held.[42] For example,

---

[37] *See* 15 U.S.C. § 1057(b).
[38] *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16.1 (4th ed. 2014) (*McCarthy on Trademarks*).
[39] *ITC Ltd. v. Punchgini, Inc.*, 482 F. 3d 135, 147 (2d Cir. 2007) (quoting *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996)).
[40] *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974). *See also ITC Ltd.*, 482 F.3d at 147; *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960).
[41] 15 U.S.C. §1058.
[42] *See, e.g., United We Stand America, Inc. v. United We Stand, America New York*, 128 F.3d 86, 93 (2d Cir. 1997); *Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of N.Y.*, 423 F. Supp. 975, 978 (E.D.N.Y. 1976); *Modular*

in *United We Stand America, Inc. v. United We Stand, America New York*,[43] the plaintiff political organization sued another political organization for infringement of the service mark "United We Stand America." The Second Circuit affirmed judgement for the plaintiff, the senior user of the mark. The panel rejected the defendant's argument that the plaintiff could not enforce its service mark rights "because [the plaintiff] registered its service mark only after [the defendant's] incorporation."[44] The Second Circuit reasoned that plaintiff was the "first user" of the mark in commerce and the defendant was "well aware of [plaintiff's] prior use" before incorporating under that name.[45] In *Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of N.Y.*,[46] the district court granted a preliminary injunction to the senior user of the mark COIT against a junior user. The court reasoned: "The right to a trademark (or service mark) is acquired through use in relation to a product (or service). Incorporation did not give defendants a right to use either the name Coit Drapery Cleaners or the mark Coit as against the property right of Coit Cal."[47]

Courts in other jurisdictions reach the same result. For example, in *American Automobile Association v. AAA Insurance Agency, Inc.*,[48] the district court granted judgment in favor the American Automobile Association after a bench trial, holding that defendant's use of "AAA" in the name of its insurance business constituted trademark infringement. The court rejected the defendant's argument that incorporating under its business name gave it trademark rights: "The fact that Defendant's name was accepted by the State Board of Insurance or by the Secretary of

---

*Cinemas of Am., Inc. v. Mini Cinemas Corp.*, 348 F. Supp. 578, 582 (S.D.N.Y. 1972) ("It is axiomatic, however, that use and not priority of incorporation is decisive.").

[43] 128 F.3d 86 (2d Cir. 1997).

[44] *Id.* at 93.

[45] *Id.*

[46] 423 F. Supp. 975 (E.D.N.Y. 1976).

[47] *Id.* at 978. *See also Christian Dior, S.A.R.L. v. Miss Dior of Flatbush, Inc.*, No. 70-C-1471, 1972 WL 18024, at *3 (E.D.N.Y. March 15, 1972) ("The fact that the New York Secretary of State permitted the use of the words Miss Dior in a corporate name has no bearing on the question of trademark infringement or unfair competition."); *The George Washington Mint, Inc. v. The Washington Mint, Inc.*, 349 F. Supp. 255, 260 (S.D.N.Y. 1972) (finding that plaintiff had priority of actual use in commerce and that "[t]he prior incorporation of the defendant, in itself, does not establish priority of trademark use").

[48] 618 F. Supp. 787 (W.D. Tex. 1985).

11

State for incorporation in Texas does not affect Plaintiff's service mark rights. The acceptance or approval of a name by a state agency is no defense to an action for infringement or unfair competition."[49] Leading commentars agree that "the fact that a junior user has a corporate charter for his name is no defense."[50]

Here, NYP Holdings and its predecessors have continuously used the NEW YORK POST Marks in connection with its publishing activities and related products and services since at least 1934.[51] In contrast, neither Hoffenberg nor New York Post Publishing Inc. ever offered goods or services in commerce between its formation in 1993 and the launch of Defendants' website in September 2014 (and, if it had, NYP Holdings would have asserted a claim for trademark infringement).[52] In fact, the Delaware Secretary of State voided the company's Certificate of Incorporation on March 1, 1995,[53] and the company did not exist for nineteen years, during most of which time Mr. Hoffenberg was in prison. Furthermore, Hoffenberg never had the right to use a business name that incorporated NEW YORK POST in the first place because he never acquired the *New York Post*, and any such right, had it even existed, which it did not, would have terminated when Hoffenberg's three-month relationship with the *New York Post* ended in March 1993.[54]

Because NYP Holdings has priority of use with respect to the NEW YORK POST Marks

---

[49] *Id.* at 797. *See also Jefferson Bankshares, Inc. v. Jefferson Savings Bank*, CIV. A. No. 89-0022-C, 1989 WL 222446, at *10 (W.D. Va. Nov. 27, 1989) (calling defendant's argument that reservation of corporate name gave it right to use the name in commerce "untenable"); *National Customer Engineering Inc. v. Lockheed Martin Corp.*, No. CV 96-8938 DDP, 1997 WL 363970, *1 n.4 (C.D. Cal. Feb. 14, 1997) ("The fact that a junior user has a corporate charter for its name is no defense.").

[50] 1 *McCarthy on Trademarks* § 9:8. *See also id.* § 9:2 ("Since use is the basis for obtaining exclusionary rights, merely obtaining a corporate charter under a corporate name does not itself confer rights in the name without actual usage."); 3 Louis Altman, *Callmann on Unfair Competition, Trademarks and Monopolies* § 20:2 (4th ed. 2014) ("A business does not obtain mark rights in a business name by reserving it with the relevant state agency for future use as a corporate name, or by incorporating under that name.").

[51] Gavenchak Decl. ¶ 8.

[52] *Id.* ¶ 40.

[53] *Id.* ¶ 15, Ex. D.

[54] *Id.* ¶ 14.

12

and has continuously used those marks in commerce, Defendants lack any trademark rights in the New York Post Publishing Inc. business name, and NYP Holdings is entitled to prevent Defendants' use of that name in connection with the provision of newspapers and online news.

### 3. Consumers Are Likely To Be Confused About the Source, Sponsorship, and Affiliation of Defendants' Website and News Stories

Defendants' use of the NEW YORK POST Marks in connection with the provision of newspapers and online news is likely to cause consumer confusion. In the Second Circuit, likelihood of confusion is assessed by following the *Polaroid* factors.[55] The eight, non-exhaustive factors are: (1) the strength of the senior user's mark; (2) the degree of similarity between the senior and junior users' marks; (3) the proximity of the products or services covered by the marks; (4) the likelihood of "bridging the gap"; (5) evidence of actual confusion of consumers; (6) the junior user's good faith in adopting the mark; (7) the quality of the junior user's product or service; and (8) consumer sophistication.[56] No single factor is dispositive, but the Second Circuit has stated that the first three factors are "perhaps the most significant."[57] On every factor in this case, the showing overwhelmingly establishes likelihood of confusion.

### a. NYP Holdings' Marks are Strong, Valid, and Protectable

Plaintiff's registrations for the NEW YORK POST Marks are valid and subsisting[58] and constitute *prima facie* evidence of NYP Holdings' exclusive right to use the marks in connection with the goods and services at issue in United States commerce.[59] Seven of Plaintiff's registrations are also incontestable.[60] Incontestable registrations are conclusive evidence of mark

---

[55] *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495-96 (2d Cir. 1961); *see also Banff, Ltd.*, 841 F.2d at 489-90.

[56] *Polaroid Corp.*, 287 F.2d at 495.

[57] *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987).

[58] Gavenchak Decl. ¶ 7, Ex. A.

[59] *See* 15 U.S.C. § 1057(b).

[60] Gavenchak Decl. ¶ 9, Ex. B. *See* 15 U.S.C. § 1065; *Wal-Mart Stores, Inc. v. Samara Bros, Inc.*, 529 U.S. 205, 209 (2000).

validity and the registrant's exclusive right to use the mark registered.[61] Furthermore, when descriptive marks, such as the NEW YORK POST marks, become incontestable, they are entitled to a conclusive presumption of distinctiveness, making them strong marks.[62]

Furthermore, NYP Holdings has exclusively, substantially, and continuously used the NEW YORK POST Marks for the sole purpose of designating the source of its goods and services.[63] NYP Holdings has also made a substantial investment in marketing and promoting the goods and services that bear the NEW YORK POST Marks.[64] There is no genuine dispute that the *New York Post* is an iconic newspaper, known throughout the country and the world, and that the NEW YORK POST marks are uniquely associated with that brand. Therefore, NYP Holdings' NEW YORK POST Marks are strong, famous, and protectable. This factor should be given substantial weight in the analysis.[65]

   **b.    Defendants' Purported Mark Is Identical and/or Confusingly Similar to the NEW YORK POST Marks**

Defendants have adopted and are using the purported trademark NEW YORK POST PUBLISHING INC., which is identical to and/or confusingly similar to the NEW YORK POST Marks.[66]   As in *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, the similarity between Plaintiff's and Defendants' marks is "obvious."[67]   The dominant portion of NEW

---

[61] 15 U.S.C. § 1115.

[62] *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 312 (S.D.N.Y., 2000) ("The registration of a trademark is also relevant to the assessment of its strength because, as discussed above, an incontestable registered trademark enjoys a conclusive presumption of distinctiveness.").

[63] Gavenchak Decl. ¶¶ 8, 11, 13.

[64] *Id.* ¶ 12.

[65] *See Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.*, No. 95 Civ. 4008 (AGS), 1995 WL 528001, at *7 (S.D.N.Y. Sept. 6, 1995) (granting preliminary injunction and noting, "[t]he strength of a mark is among the most important factors in the *Polaroid*[] analysis) (citation omitted); *T. Anthony, Ltd. v. Malletier*, No. 93 Civ. 6900 (KC),1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993) (same).

[66] *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537-538 (2d Cir. 2005). "[M]arks are considered similar when they are similar in appearance, sound, and meaning." *Clinique Labs., Inc. v DEP Corp.*, 945 F.Supp. 547, 552 (S.D.N.Y. 1996) (citation omitted).

[67] *New York City Triathlon, LLC*, 704 F. Supp. 2d at 317 ("The central and important part of each of the marks at issue is identical in appearance, sound, and meaning-the words 'New York City Triathlon,' 'NYC Triathlon,' and

YORK POST PUBLISHING INC. is NEW YORK POST, and the addition of the subordinate terms PUBLISHING and INC. does not change the mark's connotation. "It is the general rule that one may not appropriate the entire mark of another and avoid a likelihood of confusion by the addition thereto of descriptive or otherwise subordinate matter."[68]  Defendants' addition of the terms PUBLISHING and INC. to the NEW YORK POST Marks does nothing to dispel likely confusion; just the opposite, it in fact enhances the likelihood that consumers will assume an affiliation or sponsorship because NYP Holdings is in the business of publishing.  This factor alone weighs heavily in NYP Holdings' favor.

### c.    The Parties Goods/Services Are Identical

The third *Polaroid* factor (the competitive proximity of the products or services) also weighs heavily in NYP Holdings' favor.  The proximity inquiry looks both to the nature of the goods and the structure of the relevant market, and includes consideration of "the class of consumers to whom the goods are sold, the manner of advertising, the channels through which the goods are sold, and the extent to which the goods or services fall within the same class or are used together."[69]  Here, the parties' respective goods and services—a news website and print newspaper—are identical.  Furthermore, Defendants have exacerbated the potential confusion by misleadingly suggesting that Hoffenberg is "once again" affiliated with the *New York Post* and falsely claiming that he owns "[a]ll of the assets inclusive of the trademarks and the website,

---

'NYC Tri.'  Defendant's addition of the word 'Club' does not change the emphasis on 'NYC Triathlon' (and its aforementioned derivations) as the operative part of the mark.").

[68] *Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc.*, 253 F.2d 431, 432 (C.C.P.A. 1958) ("Vita-Slim" confusingly similar to "Slim") (citations omitted); *see also A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972) (finding addition of "by Bradley" did not prevent confusion between plaintiffs protected "Cross" pens and defendant's "LaCross by Bradley" pens); *Rodgers v. Wright*, 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008) (defendants' spin-off musical group "First Ladies of Chic" was confusingly similar to original "Chic"); *Am. Express Co. v. Am. Express Limousine Serv.*, 772 F. Supp. 729, 733 (E.D.N.Y. 1991) (finding the defendant's addition of "Limousine Services" to the plaintiffs "American Express" mark enhanced rather than dispelled confusion).

[69] *Clinique Labs., Inc.*, 945 F. Supp. at 553 (citations omitted).

New York Post."[70]  The third factor therefore weighs heavily in favor of a likelihood of confusion.  As for the fourth factor, "bridging the gap," the Second Circuit has held that when the parties' goods or services are already in direct competition with each other—as is the case here—there is no gap to bridge and this factor is irrelevant.[71]

### d.  Actual Confusion

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source."[72]  This is particularly true when an infringing product has been on the market for only a short time.[73]  Therefore, this factor is not applicable here.

### e.  Defendants Adopted and Used the Mark in Bad Faith

The sixth *Polaroid* factor considers whether Defendants were operating in bad faith when selecting their marks—*i.e.*, "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill, and any confusion between his and the senior user's product. The defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark."[74]

Here, Defendants commenced using the NEW YORK POST Marks on the Infringing Website and in its domain name long after the NEW YORK POST Marks achieved widespread fame, years after Hoffenberg himself acted as publisher of the *Post*, and months after Hoffenberg

---

[70] Gavenchak Decl. ¶¶ 26-29, 35, 36, Ex. K, L, P, T.

[71] *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009); *Star Indus, v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).

[72] *Lois Sportswear USA, v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986); *see also Harold F. Ritchie, Inc. v. Chesebrough–Pond's*, 281 F.2d 755, 761 (2d Cir.1960).

[73] *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y.2009) ("The absence of proof of actual confusion is not fatal to a finding of likelihood [of confusion], particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time.") (quoting *MGM-Pathe Commc'ns Co. v. Pink Panther Patrol*, 774 F. Supp. 869, 875 (S.D.N.Y.1991)); *Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1087 (S.D.N.Y.1993) ("It would be unfair to penalize plaintiff for acting to protect [its] trademark rights before serious damage has occurred.") (quoting *Lois Sportswear*, 799 F.2d at 875).

[74] *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 452 (S.D.N.Y. 2008) (citation omitted).

16

had been put on notice by NYP Holdings that any use of the NEW YORK POST Marks would be an unlawful infringement.[75] Prior to September 2014, Defendants had not used the NEW YORK POST Marks or the website's infringing domain name in connection with any goods and services, and Hoffenberg has no reasonable justification for his claim that incorporation of a shell corporation called "New York Post Publishing Inc." gives him the right to use the NEW YORK POST Marks on competing products and services. The only possible explanation is that Hoffenberg is willfully misreading the law to pick a high-profile legal fight with the *Post* to generate publicity for his competing business ventures. Indeed, since June, Hoffenberg has displayed his guilty knowledge by repeatedly challenging NYP Holdings to file suit against him and inviting counsel to serve process on him.[76] Further, the design choices on the Infringing Website demonstrate intent to deliberately mislead the public by, for example, (1) displaying "New York Post" in large white block letters over a black background on the website's homepage, followed by "Publishing Inc." in much smaller, dark purple, script letters, and (2) covering the homepage of the Infringing Website with banners reading "The Future of the New York Post" and "History of the New York Post."[77] Beyond these design choices, Defendants' have also made public statements deliberately misleading the public regarding Hoffenberg's relationship with the *New York Post* and falsely claiming ownership of the New York Post's website and intellectual property.[78] In short, Defendants' bad faith is evident and plainly favors a finding of likely confusion.

### f. Defendants' Products/Services Are of Inferior Quality

The seventh Polaroid factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior

---

[75] Gavenchak Decl. ¶¶ 11-13, 14, 20, Ex. G.

[76] *Id.* ¶¶ 19-24, 43.

[77] *Id.* ¶¶ 30-33, Ex. N. *See Web-Adviso v. Trump*, 927 F. Supp. 2d at 44 ("Such calculated exploitation of the goodwill associated with another trademark is precisely the sort of bad faith the ACPA is designed to combat.").

[78] Gavenchak Decl. ¶¶ 25-28, 35, 36, Ex. K, L, P, T.

17

quality."[79]  As explained in Part C, *infra*, the Infringing Website wrongfully links the NEW YORK POST Marks with an inferior news site that features no original reporting. This wrongful association alone represents a grave threat to the *New York Post*'s reputation and customer goodwill. Association with Defendant Hoffenberg and his criminal history only further tarnishes the brand.

### g.    Consumer Sophistication

The final *Polaroid* factor analyzes the level of sophistication of consumers in the relevant market.[80]  Sophistication "refers, not to the education or training of the purchasers, but, rather, to the ability of the purchasers to distinguish between the two trade dresses, given the attention that such purchasers ordinarily give in buying products or services."[81]  When a product is a relatively inexpensive one, purchased on impulse—such as a newspaper purchased at a newsstand—courts generally consider the product's consumers to be unsophisticated.[82] Furthermore, even sophisticated consumers may be confused when two parties' marks and services are highly similar.[83]  "[W]here the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion."[84]  Moreover, the likelihood that *New York Post* readers will mistakenly access the Infringing Website is real—as of the time of writing, the Infringing Website appears on the second page of Google search results for "New York Post Publishing."[85]  This factor likewise weighs in favor of NYP Holdings.

*    *    *

In sum, the *Polaroid* factors weigh heavily in favor of a likelihood of confusion, and

---

[79] *Pfizer*, 652 F. Supp. 2d at 523 (quotation omitted).

[80] *See MetLife, Inc.* v. *Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 235 (S.D.N.Y. 2005); *GTFM v. Solid Clothing*, 215 F. Supp. 2d 273, 298 (S.D.N.Y. 2002).

[81] *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 546 (S.D.N.Y. 2011).

[82] *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 219 (2d Cir. 2003); *W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*, 984 F.2d 567, 25 U.S.P.Q.2d 1593 (2d Cir. 1993).

[83] *See The Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999).

[84] *See McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979), *abrogated on other grounds by Bristol-Myers Squib, Co. v. McNeill-P.P.C., Inc.*, 973 F.2d 1033, 1043-44 (2d Cir. 1992).

[85] Gavenchak Decl. ¶ 50, Ex. S.

NYP Holdings is likely to succeed on its trademark infringement claims.

## B. NYP Holdings Will Likely Prevail on its Anticybersquatting Consumer Protection Act Claims

The Anticybersquatting Consumer Protection Act of 1996 (the "ACPA") holds civilly liable domain name registrants who have a bad faith intend to profit from a domain name that "is identical or confusingly similar to or dilutive of" the distinctive or famous mark of another.[86]  In addition to awarding damages, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."[87]  Courts have often noted that the ACPA targets those who "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site" and "target distinctive marks to defraud consumers."[88]

Defendants have registered and are using an infringing domain name that wholly contains the NEW YORK POST Marks—www.newyorkpostpublishinginc.com (the "Infringing Domain Name").  As demonstrated below, their conduct violates the ACPA.

### 1. The NEW YORK POST Marks Are Distinctive and Famous

The NEW YORK POST Marks are recognized as representing one of the most famous newspapers in the country.[89]  NYP Holdings has spent hundreds of millions of dollars producing the *New York Post*, including significant amounts of money advertising and promoting it.[90]  As a result of this investment and the continuous, exclusive, and widespread use of the NEW YORK POST Marks in commerce, these marks have become famous and attained a high degree of acquired distinctiveness.  As noted above, many of the U.S. registrations for the NEW YORK POST Marks

---

[86] 15 U.S.C. § 1125(d)(1)(A).

[87] 15 U.S.C. § 1125(d)(1)(C).

[88] *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004); *see also, e.g., Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.*, No. 01Civ.2950, 2005 WL 2148925, at *12 (S.D.N.Y. Sept. 6, 2005); *Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, No. 04 Civ. 6107, 2006 WL 2289847, at *13 (S.D.N.Y. Aug. 8, 2006).

[89] Gavenchak Decl. ¶ 11.

[90] *Id*. ¶ 12.

19

are incontestable, thus entitling NYP Holdings to a conclusive presumption of distinctiveness.[91]

## 2. The Infringing Domain Name Is Identical and/or Confusingly Similar to the NEW YORK POST Marks

The Infringing Domain Name is identical and/or confusingly similar to the NEW YORK POST Marks. The inclusion of a plaintiff's trademark combined with usage of the mark on the website has been held to be sufficient for a finding of confusing similarity for ACPA purposes.[92] The fact that the most distinctive aspect of the NEW YORK POST Marks ("NEW YORK POST") appears without alteration in the Infringing Domain Name, plainly referring to NYP Holdings' brand, compellingly shows that the Infringing Domain Name is identical and/or confusingly similar to the NEW YORK POST Marks. The surplus generic term "publishing" and "inc." inserted into the domain do not eliminate the confusing similarity. Courts have consistently found the addition of minor generic terms to the disputed domain names is "irrelevant."[93]

## 3. Defendants Have Bad-Faith Intent to Profit from the NEW YORK POST Marks

For the reasons stated in Part I.A.3(e), the evidence plainly demonstrates that Defendants registered the Infringing Domain Name with a bad-faith intent to profit.[94]

\*     \*     \*

Given the evidence of the distinctiveness and fame of the NEW YORK POST Marks, the confusing similarity of the Infringing Domain Name to the NEW YORK POST Marks, and

---

[91] 15 U.S.C. § 1115(b); *Paco Sport*, 86 F. Supp. 2d at 312.

[92] *Mattel, Inc. v. Internet Dimensions, Inc.*, No. 99 Civ. 10066, 2000 WL 973745, at \*3-6 (S.D.N.Y. July 13, 2000).

[93] *Daimler Chrysler v. The Net Inc.*, 388 F.3d 201, 205-206 (6th Cir. 2004) (domain name "foradodge.com" confusingly similar to plaintiff's "Dodge" trademark); *see also Spear, Leeds, & Kellogg v. Rosado*, 122 F. Supp. 2d 403, 406 (S.D.N.Y. 2000) *aff'd*, 242 F.3d 368 (2d Cir. 2000) (domain names "redi-ecn.com" and "redixt.com" confusingly similar to plaintiff's REDI mark); *Web-Adviso v. Trump*, 927 F. Supp. 2d. 32, 42 (domain names such as "trumpabudhabi.com" and "trumpbeijing.com" confusingly similar to Donald Trump's marks); *Omega S.A. v. Omega Engineering, Inc.*, 228 F. Supp. 2d 112, 126-129 (D. Conn. 2002) (concluding that "omegawatch" and "omegatime" were confusingly similar to "OMEGA").

[94] *See* 15 U.S.C. § 1125(d)(1)(B)(i) (listing factors).

20

Defendants' bad-faith intent, NYP Holdings is likely to succeed on its ACPA claims.

## C.     Injunctive Relief is Necessary to Prevent Irreparable Harm

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."[95]   In the absence of injunctive relief, NYP Holdings faces the immediate prospect of substantial irreparable harm, not only through continued publication of the Infringing Website that confuses and misleads the reading public, but also through publication "this October" of competing print newspapers using the NEW YORK POST Marks.[96]  Injunctive relief is particularly appropriate in a case involving a unique asset, such as a trademark, because damage to that asset is difficult, if not impossible, to quantify.[97]   When—as here—a junior user misappropriates that unique asset in the same market, on the same goods or services, the damage to the trademark owner through diminished goodwill, loss of control over reputation, and loss of quality control is irreparable.[98]

Publications such as the *New York Post* live and die by their reputations, and so they must earn and keep their readers' trust.  Confusion between NYP Holdings' high-quality newspaper and website on the one hand, and Defendants' lesser-quality website on the other, erodes that all-important reader trust and undermines NYP Holdings' goodwill and reputation.[99]  The Infringing

---

[95] *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

[96] Gavenchack Decl. ¶ 44, Ex. Q.

[97] *New York City Triathlon, LLC*, 704 F. Supp. 2d at 343 ("Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark' ... because loss of control over one's reputation is neither 'calculable nor precisely compensable.'") (quoting *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)); *see also Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).

[98] *United States Polo Ass'n v. PRL USA Holdings*, 800 F.Supp.2d 515, 541 (S.D.N.Y. 2011) (absent an injunction, given the likelihood of confusion shown, "the reputation and goodwill cultivated by [plaintiff] would be out of its hands. The [defendant's] product may or may not be of high quality, sold with sufficient care to customer service, or convey the same branding image that has been highly cultivated by [plaintiff]."); *New York City Triathlon*, 704 F. Supp. 2d at 326 ("Plaintiff lost goodwill and the control of its reputation at the moment Defendant launched its infringing triathlon club name, and Plaintiff continues to face this loss until Defendant's acts are enjoined. No monetary sum can sufficiently remedy Plaintiff for this type of harm to its name and brand.").

[99] *See* 145 Cong. Rec. S10,515 (statement of Sen. Orrin Hatch) (Speaking on the proposed ACPA, noting the trademark laws "prohibit the unauthorized uses of other people's marks because such uses lead to consumer

Website contains what appear to be hasty rewrites of stories published by other news outlets and syndicated content from the Tribune Content Agency.[100] Its stories and coverage possess none of the original reporting, local color, and style that readers have come to associate with the *New York Post*.[101] Defendants' infringing activities also damage NYP Holdings' goodwill and reputation by linking the *New York Post* with Hoffenberg's serious criminal history, as well as dubious offers on the Infringing Website to pay readers $1 million for "stories about great scandals."[102] Such irreparable injury has been found sufficient for the granting of a preliminary injunction.[103]

An injunction is especially appropriate when, as here, there is a threat of ongoing infringement.[104] Defendants have continued to use the NEW YORK POST Marks despite receiving a cease-and-desist letter and having their website temporarily shut down in response to NYP Holdings' September 17 letter. In the face of these actions, Hoffenberg has continued to falsely assert a claim of rights to the NEW YORK POST Marks, has expressed an intention to continue using the NEW YORK POST Marks, and has threatened NYP Holdings and its lawyers with sanctions should NYP Holdings try to enforce its rights.[105] Defendants now plan to expand their infringement by publishing a competing newspaper using the NEW YORK POST Marks and licensing other free newspapers to do so, further depriving NYP Holdings of control over the *New York Post* brand and reputation.[106]

Finally, harm may be irreparable where a defendant is unlikely to be able to pay a damages

---

confusion, undermine the goodwill and communicative value of the brand names they rely on, and erode consumer confidence in the marketplace generally.").

[100] Gavenchak Decl. ¶ 47. Whether the infringing website actually has valid licenses from syndicators like the Tribune Content Agency or whether the licensors were victims of confusion remains to be explored in discovery.

[101] *Id.* ¶ 49.

[102] *Id.* ¶ 47, Ex. R.

[103] *See, e.g., New York City Triathlon, LLC.*, 704 F. Supp. 2d at 343; *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y.2011).

[104] *Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 221 (S.D.N.Y. 2011).

[105] Gavenchak Decl. ¶ 43; Handman Decl., Ex. B.

[106] Gavenchak Decl. ¶¶ 44, 48, Ex. Q.

22

award.[107] Here, defendant Hoffenberg has recently been released from prison and owes hundreds of millions of dollars in restitution to the Towers investors. He has the chutzpah to claim that he will be able to make restitution by what amounts to his unlawful use of the NEW YORK POST Marks. New York Post Publishing Inc. has been dormant for nearly 20 years and was only recently revived. It is unlikely that Defendants possess the assets to satisfy the substantial damages award that NYP Holdings will be entitled to as a result of their unlawful activities.

**D.     NYP Holdings Has Inadequate Remedies at Law, and the Balance of Hardships and Public Interest Favor an Injunction**

NYP Holdings can also make the required showing that it has inadequate remedies at law and that the balance of hardships and the public interest favor the issuing of a preliminary injunction.

First, as explained in Part C, *infra*, Defendants' unlawful activities threaten NYP Holdings with immediate and irreparable harm to its reputation and goodwill unless enjoined. Courts have found that remedies at law are inadequate to compensate for the types of harm to reputation and goodwill present here.[108]

Second, the balance of hardships favors NYP Holdings. While NYP Holdings faces immediate and irreparable harm to its legitimate business interests, Defendants have no legitimate interest in their unauthorized use of the NEW YORK POST Marks to provide online news or sell newspapers. Given the illegality of their conduct and "the probable outcome of this action, [loss of business] is a loss which [defendants] may justifiably be called upon to bear."[109] Furthermore. even if Defendants could establish some theoretical adverse financial impact from a temporary injunction, they are in no position to complain about it, as they should have

---

[107] *Omega Importing Corp.*, 451 F.2d at 1195; *TECNIMED Srl v. Kidz-med Inc.*, 763 F. Supp. 2d 395, 413 (S.D.N.Y. 2011).

[108] *United States Polo Ass'n v. PRL USA Holdings*, 800 F.Supp.2d 515, 541 (S.D.N.Y. 2011) ("Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law cannot adequately compensate Plaintiff for its injuries.").

[109] *Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

considered the consequences of their actions *before* they created a website that has trademark infringement as its very purpose and design.[110]

In a similar case, *Colonial Radio Corp. v. Colonial Television Corp.*,[111] the district court enjoined the defendant, a junior user of the COLONIAL mark in its business name. The court held that the New York Secretary of State's registration of the defendant's business name "d[id] not excuse" the defendant's infringement.[112] In granting the injunction, the court reasoned that the defendant was a "comparatively new corporation" and "can easily change its name."[113] The court went on: "It should have made the change when plaintiff first complained in July of 1947. The equities, and the balancing of conveniences favor the plaintiff."[114] The same is true here.

Finally, the Court must "ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction."[115] The Second Circuit has long held that there is a "strong interest in preventing public confusion."[116] NYP Holdings has established that Defendants' actions are likely to cause consumer confusion. Therefore, the public interest favors an preliminary injunction.

**E. There is a Fair Ground for Litigation and the Balance of Hardships Tips Decidedly in NYP Holdings' Favor**

Even if this Court does not find NYP Holdings is likely to succeed on the merits of one or more of its claims, NYP Holdings submits that—for the same reasons that NYP Holdings has articulated it is likely to prevail on those claims—it has at the very least raised serious questions going to the merits of those claims and shown that the balance of hardships tips decidedly in its

---

[110] *See Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 312 (D.N.J. 1998).
[111] 78 F. Supp. 546 (S.D.N.Y. 1948).
[112] *Id.* at 550.
[113] *Id.* at 554.
[114] *Id.*
[115] *Salinger*, 607 F.3d at 80 (quoting *eBay*, 547 U.S. at 391, 126 S.Ct. 1837).
[116] *ProFitness Phys. Therapy Ctr. v. Pro-Fit Ortho. & Sports Phys. Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002).

DWT 24928526v6 3930033-000043

favor.[117] At the very least, Parts A and B, *supra*, demonstrate that NYP Holdings has raised substantial objections and questions that are fair game for litigation. The balance of hardship weighs in NYP Holdings' favor for the reasons discussed in Part D, *supra*.

## CONCLUSION

Based upon the foregoing, NYP Holdings respectfully requests that this Court issue an order enjoining Defendants from infringing the NEW YORK POST Marks and violating the ACPA, including an order disabling Defendants' Infringing Website and ordering the www.newyorkpostpublishinginc.com domain name transferred to NYP Holdings.

Dated: New York, New York
October 16, 2014

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: _____
Laura R. Handman
Samuel M. Bayard
Camille Calman

1633 Broadway, 27th Floor
New York, New York 10019
(212) 489-8230

---

[117] *Christian Louboutin*, 696 F.3d at 215.

DWT 24928526v6 3930033-000043