UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------ x
NYP Holdings, Inc.,

                Plaintiff,

        - against -

NEW YORK POST PUBLISHING INC.,
STEVEN JUDE HOFFENBERG, and JANE
DOES 1-10,

                Defendants.
------------------------------------------------------------ x

14 Civ. 8310

**DECLARATION OF
EUGENIE C. GAVENCHAK**

I, EUGENIE C. GAVENCHAK, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am Senior Vice President, Deputy General Counsel at News Corporation. I submit this declaration in support of Plaintiff's Order to Show Cause for Preliminary Injunction and Expedited Proceedings.

2. I am over eighteen years of age and competent to attest to the contents of this declaration. I am authorized by NYP Holdings, Inc. ("NYP Holdings") to make this statement on its behalf. Unless otherwise stated, the facts and matters referred to in this statement are within my personal knowledge, or are based on information gleaned from documents and records of NYP Holdings to which I have access, and are true to the best of my knowledge, information, and belief.

3. Plaintiff NYP Holdings, Inc. is a wholly-owned subsidiary of News Corporation and is the publisher of the *New York Post*.

## *The NEW YORK POST Marks*

4. The *New York Post* is the oldest, continuously published daily newspaper in the United States, having first been published by Alexander Hamilton in 1801. Today, the *New York Post* is sold in many states in the United States, both at newsstands and by subscription.

5. The *New York Post* began publishing news on the web in 1996 and has done so continuously since then. The *New York Post*'s website, www.nypost.com ("NYPost.com"), is one of the largest newspaper websites in the United States with approximately 98 million page views per month. NYPost.com is accessed by users in many countries throughout the world.

6. NYP Holdings is the sole and exclusive owner of a number of United States registered trademarks, including but not limited to the following (the "NEW YORK POST Marks"):

| TRADEMARK | APP/REG. NO | APP/REG. DATE | GOODS/SERVICES |
|---|---|---|---|
| NEW YORK POST | 1,526,818 | 2/28/89 | Daily newspaper |
| NEW YORK POST | 2,213,076 | 12/22/98 | Daily newspaper covering a variety of topics |
| NEW YORK POST | 3,639,502 | 6/16/09 | Computer services, namely, providing an online newspaper featuring current local, national and international news and news analysis on a wide variety of topics, photographs, information about a wide variety of topics related to business, sports, gossip, entertainment, celebrities, celebrity life style, travel, fashion and clothing, health, coupons, games, and astrology, accessible via the Internet; publication of a daily electronic newsletter featuring a wide variety of topics related to current local, national and international news, business, sports, gossip, entertainment, travel, fashion, |

2

| TRADEMARK | APP/REG. NO | APP/REG. DATE | GOODS/SERVICES |
|---|---|---|---|
| | | | health and local weather, accessible via the Internet |
| NEW YORK POST | 3,652,365 | 7/7/09 | Electronic transmission of newspaper and website content to mobile devices |
| NEW YORK POST | 4,056,288 | 11/15/11 | Downloadable software in the nature of an application for obtaining news, information, commentary, and textual, audio, and visual content of the type found in general interest publications on mobile and stationary consumer electronic devices |
| NEW YORK POST | 3,098,182 | 5/30/06 | Printed non-fiction books on a variety of topics |
| NEW YORK POST | 3,199,514 | 1/16/07 | Tee shirts, sweatshirts |
| NEW YORK POST | 3,199,515 | 1/16/07 | Tee shirts, fashion tops, sweatshirts, and underwear |
| NEW YORK POST | 3,357,150 | 12/18/07 | Mugs made from glass or ceramic |
| NEW YORK POST | 3,319,743 | 10/23/07 | Mugs made from glass or ceramic |

7. Annexed as Exhibit A are true and correct copies of the Certificates of Registration for the NEW YORK POST Marks from the United States Patent and Trademark Office. All of the registrations in Exhibit A are valid, subsisting, unrevoked, and uncancelled.

8. Both prior to and after these registrations, NYP Holdings and its predecessors have continuously used the NEW YORK POST Marks, or predecessors to those marks, in connection with the *New York Post*'s print and online publishing activities and related merchandise since 1934.

9. Registrations number 1,526,818, 2,213,076, 3,098,182, 3,199,514, 3,199,515, 3,319,743, and 3,357,150 have become incontestable under 15 U.S.C. §1065. Annexed as Exhibit B are true and correct copies of the Section 15 Declarations for these marks filed with the United States Patent and Trademark Office.

10. NYP Holdings also owns common law rights in the NEW YORK POST Marks for use in connection with the provision of news content in print and digital mediums of all kinds, among other things.

### *The NEW YORK POST Marks Are Famous and Distinctive*

11. The *New York Post* is one of the most famous newspapers in the country. Through NYP Holdings' continuous and exclusive use of the NEW YORK POST Marks in United States commerce for decades, the NEW YORK POST Marks have come to be widely recognized and relied upon by the trade and the public as identifying the *New York Post*, and as distinguishing it from other publications. There is no other publication like the *New York Post*, and it is a famous and iconic media brand.

12. NYP Holdings has invested heavily in creating, maintaining, and promoting the goodwill associated with the NEW YORK POST Marks. The company has spent hundreds of millions of dollars producing the *New York Post*, including significant amounts on advertising and promotion of the newspaper, website, and the related NEW YORK POST Marks throughout United States in a variety of media. In addition to traditional advertising, NYP Holdings actively promotes the *New York Post* and the NEW YORK POST Marks through social media platforms such as Facebook and Twitter.

13. The NEW YORK POST Marks are among NYP Holdings' most important and valuable assets, as they have become strong and distinctive source indicators. NYP Holdings' continuous and broad use of the NEW YORK POST Marks in connection with its news

4

publishing activities has expanded the *New York Post*'s renown and enabled these marks to achieve celebrity in the media industry and among the general public.

### *Hoffenberg's Short-Term Involvement with the New York Post and His Conviction for Fraud*

14. Defendant Steven Hoffenberg was the *Post*'s publisher from January to March 1993, and attempted to buy the *New York Post* from its then-owner, Peter Kalikow (who had declared bankruptcy). Hoffenberg was unable to complete the purchase because the SEC filed a civil suit against him and his company Towers Financial Corporation, which resulted in the freezing of Towers' assets. Instead, another investor, Abraham Hirschfeld, briefly took over management of the *Post*, which was ultimately transferred in October 1993 to its current owner, NYP Holdings. Annexed as Exhibit C are true and correct copies of news articles discussing Defendant Hoffenberg's short-term involvement with the Post in 1993.

15. During his momentary tenure at the *Post* and for unknown reasons, Hoffenberg created a Delaware corporation called New York Post Publishing Inc. (the "Corporation"). According to public records, the Delaware Secretary of State voided the Corporation's Certificate of Incorporation under Delaware Corporation Law § 502, apparently for failure to file its annual franchise tax report and pay the franchise tax due. Annexed as Exhibit D are true and correct copies of records on file with the Delaware Secretary of State pertaining to the Corporation.

16. In 1997, Hoffenberg was sentenced to 20 years in prison for defrauding the investors in Towers. Mr. Hoffenberg was ordered to pay $476 million in restitution to the investors. Annexed as Exhibit E are true and correct copies of news articles regarding Hoffenberg's conviction and imprisonment.

5

DWT 24961975v6 3930033-000043

### *Hoffenberg Revives the Defunct Corporation*

17. According to public records, Mr. Hoffenberg was released from prison on October 11, 2013. Annexed as Exhibit F is a true and correct copy of a print out for Mr. Hoffenberg from the Federal Bureau of Prisons website at http://www.bop.gov/inmateloc/.

18. According to public records, on June 12, 2014, Hoffenberg filed a Certificate of Renewal with the Delaware Secretary of State to bring the defunct Corporation back into good standing. *See* Exhibit D.

### *Initial Contacts with Hoffenberg over New York Post Publishing Inc. Name*

19. On June 16, 2014, a lawyer named Anthony J. Piacentini contacted me by telephone, purporting to represent Hoffenberg. Mr. Piacentini informed me that Hoffenberg was planning to use the name New York Post Publishing Inc. and that Mr. Piacentini was authorized to accept service in the event that NYP Holdings sued Hoffenberg for using this name.

20. On June 24, 2014, I wrote a letter to Mr. Piacentini, copying Hoffenberg, warning them that Hoffenberg had no rights in the *Post*'s name or trademarks and that "any imaginable use in commerce [of the New York Post Publishing Inc. name] would infringe NYP Holdings' intellectual property rights, and NYP Holdings will not hesitate to take legal action against your client to defend its rights." A true and correct copy of the letter is annexed hereto as Exhibit G.

21. I received a response from Mr. Piacentini on June 24, 2014, which stated: "Pleased be herein advised, specifically in connection with the contents of your letter dated June 20, 2014, that I am not representing Mr. Steven Hoffenberg or his corporation, New York Post Publishing Incorporated. Therefore, any and all service of process, or any correspondence or legal documents you may generate on behalf of your client, must be served on Mr. Steven [sic]." A true and correct copy of the letter is annexed hereto as Exhibit H.

22. On June 24, 2014, I resent a copy of the letter to Hoffenberg by email and spoke with him on the telephone. In my email, I asked him to direct future correspondence to me by email and requested that he let me know when he hired another lawyer. A true and correct copy of that email is annexed as Exhibit I.

23. On July 8, 2014, I received an email from Hoffenberg in response to my June 24, 2014 letter. The email provided no substantive response or justification for Hoffenberg's threatened use of the NEW YORK POST Marks, stating, among other things: "Repeated Legal Notice Is Served On NewsCorp In The OUTRAGE Of Your FRAUD In The NewsCorp E Mail That You Served on Mr. Hoffenberg in June 2014 Why Are You Covering Up The NewsCorp Constant INJURY To The Towers Investors Major Restitution You Can Run But You Can't Hide [sic passim]." Hoffenberg re-sent this email to me twice more on July 8 and then again on July 9 and 10. A true and correct copy of the email is annexed as Exhibit J.

24. On August 28, 2014, Hoffenberg called News Corp.'s legal department and spoke with a legal secretary. The secretary told me that Mr. Hoffenberg said that he "wants to start printing the NY Post again."

### *Misleading Statements to the Public*

25. Hoffenberg and/or one or more of the Defendants in this action issued a press release on August 25, 2014 (the "August 25 Press Release"). A true and correct copy of the August 25 Press Release is annexed hereto as Exhibit K.

26. The August 25 Press Release states repeatedly that Hoffenberg will "**once again** publish the New York Post Publishing Inc." (emphasis added) Because Hoffenberg was briefly the publisher of the *New York Post*, the statement that he is "once again" publishing the "New York Post Publishing Inc." creates the misleading impression that Hoffenberg is "once again" the publisher of the *New York Post*.

7

27. The August 25 Press release then exacerbates this misleading impression by stating: "Although he has spent a number of years away from the newspaper, his return is a welcomed one by many vital persons involved with NewsCorp." This statement conveys the impression that Hoffenberg has returned to "the newspaper," meaning the *New York Post*, with the blessing of News Corporation, all of which is patently false.

28. Hoffenberg and/or one or more of the Defendants in this action issued a press release on September 5, 2014 titled "Mogul Steven Hoffenberg Goes Head to Head with Rupert Murdoch Over the New York Post" (the "September 5 Press Release"). Among other things, the September 5 Press Releases states that Hoffenberg "lost his ownership of the paper while still remaining [sic] rights to New York Post Publishing Inc. as well as the publications [sic] website and trademarks." There is no basis for the false statement that anyone other than NYP Holdings owns the *New York Post*, NYPost.com, and the NEW YORK POST Marks. A true and correct copy of the September 5 Press Release is annexed hereto as Exhibit L.

### *The Infringing Website*

29. On September 16, 2014, my colleagues and I discovered that Hoffenberg and/or one or more of the other Defendants in this action were publishing a website at www.newyorkpostpublishinginc.com (the "Infringing Website"). Annexed as Exhibit M is a true and correct copy of the WHOIS record for the Infringing Website in the database maintained by DomainTools, LLC at whois.domaintools.com.

30. The Infringing Website's homepage features the mark NEW YORK POST at the very top of the page, functioning as a masthead for the Infringing Website. The words "New York Post" appear in large white block letters over a black background, followed by "Publishing Inc." in smaller, dark purple, script letters:

8



This presentation clearly uses and emphasizes the mark NEW YORK POST.

31. Besides using the mark NEW YORK POST prominently at the top of the page, the Infringing Website's homepage has a layout, font style, and overall look-and-feel that resembles the trade dress and visual appearance of NYPost.com's homepage:



32. The Infringing Website's home page features current news headlines that link to news content elsewhere on the website; a photo of a *New York Post* cover from 1993 reading "Hoffenberg Saves the Post"; a banner reading "The Future of the New York Post"; a link to a

9

"History of the New York Post"; and a menu of sections including "News," "Entertainment," "Opinions," "Metro," "Fashion," "Sports," and "Liz Smith." Liz Smith is a well-known, former gossip columnist for the *New York Post*, who now writes a syndicated column. Annexed as Exhibit N are true and correct copies of representative pages of the Infringing Website.

33. Like the homepage, the pages for each news story on the Infringing Site have the mark NEW YORK POST emblazoned at the top of the page. Each of the story pages also includes a photo of a *New York Post* cover from 1993 reading "Hoffenberg Saves the Post" and a link to a "History of the New York Post." Like the homepage, these pages have a layout, font style, and overall look-and-feel that resemble the trade dress and visual appearance of pages on NYPost.com. Annexed as Exhibit O are true and correct copies of representative webpages from NYPost.com.

34. The Infringing Website currently features commercial advertising for the Angus Club Steakhouse and Pazzo Pizza (both located in Manhattan); the Pocono Mountains Film Festival; and Cutex Nail Polish Remover. Infringing Website also features ads for business that that appear to be affiliated with Hoffenberg, including Christ Couture and towersinvestors.com.

35. The Infringing Website states: "All of the assets inclusive of the trademarks and the website, New York Post, which receives 78 million hits per day, are rightfully owned by Steven Hoffenberg and TowersInvestors.com, not Rupert Murdoch." A true and correct copy of the webpage is annexed hereto as Exhibit P. There is no basis for the false statement that anyone other than NYP Holdings owns the *New York Post*, NYPost.com, and the NEW YORK POST Marks.

36. On another page on the Infringing Website titled "The Future of the New York Post," Defendants mislead readers by invoking the history of the *New York Post*—including its

10

founding in 1801 by Alexander Hamilton—as part of a purported valuation of the intellectual property associated with New York Post Publishing Inc. and Hoffenberg's other media ventures. A true and correct copy of the webpage is attached as Exhibit T.

37. Hoffenberg and/or one or more of the other Defendants in this action also operates a related website called "Post All Star News," at http://starstruck.1800gotnerd.com. That website also purports to offer news content, and (like the Infringing Website) displays a photo of a *New York Post* cover from 1993 reading "Hoffenberg Saves the Post," and bears the identification at the bottom: "Steven J. Hoffenberg, CEO New York Post Publishing Inc. licensed to POSTALLSTARNEWS.COM."

38. NYP Holdings did not authorize Defendants' above-described uses of the NEW YORK POST Marks on the Infringing Website, the "Post All Star News" website, or in the domain name of the Infringing Website.

39. Defendants' above-described uses of the NEW YORK POST Marks on the Infringing Website, the "Post All Star News" website, and in the domain name of the Infringing Website are likely to lead the general public to believe that Defendants' website emanates from, or is sponsored by or affiliated with the *New York Post* and/or NYP Holdings, when in truth and in fact it is not.

40. NYP Holdings polices its trademark rights vigorously and monitors the Internet and other channels of trade for infringing uses of its trademarks. Until the Infringing Website appeared, NYP Holdings had not discovered any previous uses by Hoffenberg or anyone else of the name "New York Post Publishing Inc." (or any similar name) in connection with any goods or services in commerce. Had NYP Holdings learned of any earlier uses in commerce of its trademarks, it would have taken action to enforce its rights, just as it is doing in this action.

## *NYP Holdings Takes Steps to Police Its Right and Hoffenberg Refuses to Cease and Desist*

41. On September 17, 2014, after discovering the Infringing Website, outside counsel for NYP Holdings, on my instruction, sent a letter to the Infringing Website's hosting service and domain registrar demanding that it withdraw its services from the Infringing Website. The September 17 letter is attached as Exhibit A to the Declaration of Laura R. Handman ("Handman Decl.")

42. The hosting service and registrar temporarily disabled the Infringing Website and its domain name on or about September 18, 2014, but Defendants were able to get the website reactivated, and the website remains active.

43. Since September 17, in conversations and email with NYP Holdings' outside counsel, Hoffenberg has continued to falsely assert a claim of rights to the NEW YORK POST Marks, has indicated that he plans to continue using the NEW YORK POST Marks, and has threatened NYP Holdings and its lawyers with sanctions should NYP Holdings try to enforce its rights. A copy of an email to NYP Holdings' outside counsel titled "FED CIVIL RULE SANCTIONS AGAINST YOUR LAW FIRM IN MURDOCH MASSIVE FRAUD" is attached to Handman Decl. as Ex. B. In nearly all of my interactions with him since June 2014, Hoffenberg has challenged NYP Holdings to file suit against him and has invited me to serve process on him.

## *Defendants' Plan to Distribute a Print Newspaper*

44. On October 6, 2014, NYP Holdings discovered an article on the Infringing Website with the title "Free New York Post Publishing Inc To Hit Newsstands This October." The article states: "Businessman mogul Steven J. Hoffenberg, CEO/Publisher New York Post Publishing Inc. has announced that the newspaper, which is currently online will expand to newsstands free of charge." It further states: "Always on the cutting edge of progressive

12

newspaper publishing, Hoffenberg is partnering with other free newspapers, licensing them the New York Post Publishing Inc title. This will make New York Post Publishing Inc. the number one newspaper in America in circulation and a force to reckon with, revolutionizing the newspaper industry." A true and correct copy of the webpage is annexed as Exhibit Q.

### *Irreparable Harm to the New York Post's Reputation and Goodwill*

45. The Defendants' use of the NEW YORK POST Marks in connection with competing news content greatly harms the *New York Post* brand. Unless these activities are stopped, consumers will be deceived, and the distinctiveness of the NEW YORK POST Marks and associated goodwill will be irreparably damaged.

46. As a news organization, the *New York Post* depends on its reputation for quality journalism. Customers know the New York Post as a newspaper and news website dealing with daily issues in a distinctively original manner. Defendant's infringing use of the NEW YORK POST Marks threatens to undermine customer expectations and trust, and therefore irreparably harms the *New York Post*'s reputation with the reading public and deprives it of customer goodwill.

47. By using the NEW YORK POST Marks on the Infringing Website and elsewhere, Defendants wrongfully associate the *New York Post* with poor-quality news content. Many of the news stories on the Infringing Website appear to be hasty rewrites that are blatantly derivative of content from other news outlets like CNN and the Associated Press. While the Infringing Site also purports to contain syndicated content from the Tribune Content Agency, the Infringing Website's stories possess none of the original reporting, local color, and style that readers have come to associate with the *New York Post. See* Exhibit N. The Infringing Website also contains a questionable offer, from a man who owes millions in restitution, to pay "up to one million dollars" to readers who send in "stories about great scandals." *See* Exhibit R. Even

13

if the Infringing Website were publishing high-quality content, the injury to the *New York Post* brand from consumer confusion would be significant and irreparable. Linking the *New York Post* to such inferior and poorly conceived content magnifies the irreparable harm.

48. Defendants' plan to publish a competing newspaper using the NEW YORK POST Marks "this October" will greatly exacerbate the irreparable harm already being suffered by NYP Holdings, further depriving it of control over the *New York Post* brand and reputation. Defendants' plan to license other newspapers to use the NEW YORK POST Marks would multiply the harm exponentially and undermine the capacity of the NEW YORK POST Marks to serve as distinctive source indicators.

49. By using the NEW YORK POST Mark on the Infringing Website and elsewhere, Defendants wrongfully associate the *New York Post* with Defendant Hoffenberg's criminal history—a guilty plea in 1995 to conspiracy to commit federal securities fraud and other crimes for which he was sentenced to 20 years in prison by Judge Robert Sweet—and with his ongoing efforts to pay back defrauded investors. For example, the August 25 Press Release, after falsely stating that he is "once again" publishing the "New York Post Publishing Inc.," goes on: "Hoffenberg has committed himself and is driven to pay restitution of over $700 million to the 200,000 victims in the TowersInvestors.com fraud." Linking the *New York Post* with such fraudulent conduct causes loss of customer goodwill and other unquantifiable harm to NYP Holdings' business and trademarks.

50. The likelihood that *New York Post* readers will mistakenly access the Infringing Website is real—as of the time of writing, the Infringing Website appears on the second page of Google search results for "New York Post Publishing." Annexed as Exhibit S is a true and correct copy of the second page of Google search results for "New York Post Publishing."

14

I declare the foregoing to be true under penalty of perjury.

Executed in New York, New York, this 15th day of October, 2014.

_____
Eugenie C. Gavenchak

DWT 24961975v6 3930033-000043