eav2nypa

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NYP HOLDINGS,

              Plaintiff,          New York, N.Y.

         v.               14 Civ. 8310(VM)

NEW YORK POST PUBLISHING,
INC.,

              Defendant.

------------------------------x

                          October 31, 2014
                          9:10 a.m.

Before:

                  HON. VICTOR MARRERO,

                          District Judge

                    APPEARANCES

DAVIS WRIGHT TREMAINE, LLP
    Attorneys for Plaintiff
BY:  LAURA R. HANDMAN
    SAMUEL M. BAYARD

TODD A. ZUCKERBROD, P.A.
    Attorney for Defendant New York Post Publishing, Inc.
BY:  TODD A. ZUCKERBROD

STEVEN JUDE HOFFENBERG
    Pro Se Defendant

eav2nypa

1        THE COURT:  This is a proceeding in the matter of NYP

2   holdings v. New York Post Publishing, Inc.  It is docket number

3   14 Civ. 8310.

4        The court scheduled this proceeding upon request of

5   the plaintiff for an order to show cause for preliminary

6   injunction.  The court issued that order on October 16.  I had

7   directed the parties to submit appropriate briefing and appear

8   at this hearing today.

9        The court has received submissions from both sides.

10       First, the court has received from the defendant what

11  purports to be a motion requesting the court's extension of

12  time for the United States' mandated appearance under the Hoff

13  restitution victims' payments from two defendants that are

14  demanded in the Mandatory Victims Restitution Act, whereby the

15  U.S.A. must litigate for the victims.  In that motion the

16  defendant asks the court extension of time allowing for the USA

17  to appear in the action at bar mandated by the Mandatory

18  Victims Restitution Act.

19       The court also received a request from the defendant,

20  Mr. Hoffenberg, appearing *pro se*, to be allowed to bring two

21  electronic devices, an iPhone and an iPad, into the courtroom.

22  The court granted that request, but stresses at this point that

23  the request is granted on the condition that the defendant

24  abide by all of the rules that pertain to the use of electronic

25  devices in the courtroom when allowed.  Those are set forth in

1    the standing order permitting certain litigants to bring such

2    devices into the courtroom.  Any use of the device in any way

3    that may interfere with the proceeding or may be used for

4    improper purposes, purposes not permitted, such as recording or

5    taking photographs, will lead the court to revoke that order.

6         Let me first note that the defendant was directed to

7    respond to the plaintiff's order to show cause and submit any

8    responsive papers by October 24, 2014.  The only submission

9    that the court received from the defendant in response to that

10   order were the two motions that I have just referred to.

11        With regard to the motion characterized as requesting

12   an extension of time for the United States' appearance in this

13   action, the court finds that there is no relevance whatsoever

14   of that matter, whatever the matter is referred to by the

15   defendant in this proceeding; and, consequently, the court does

16   not believe any action is necessary on that request other than

17   to deny it on the grounds of irrelevance.

18        The court received from plaintiff a reply which

19   presumably was triggered by the defendant's submission, and

20   that, too is part of the record.

21        In this proceeding, the plaintiffs ask the court for

22   injunctive relief under several statutes for trademark

23   infringement in violation of the Lanham Act and trademark

24   infringement, false designation of origin, and unfair

25   competition also under the Lanham Act, trademark dilution under

eav2nypa

the Lanham Act, trademark cyber piracy under the Lanham Act,

common law trademark infringement and unfair competition,

trademark dilution in violation of New York General Business

Law.  However, the plaintiff seeks to enjoin join the

defendants from infringing the New York Post marks, including

but not limited to the New York Post Publishing, Inc.,

trademark and the New York Post Publishing, Inc., domain name.

          The court notes that the defendant individually,

Stephen Jude Hoffenberg, made an appearance *pro se* and, as of

this morning, there had been no appearance on behalf of the

corporate defendant, although the court has some filing from a

Mr. Todd Zuckerbrod, who apparently may be representing the

corporate defendant.

          Mr. Zuckerbrod, are you here and what is your status

in this matter?

          MR. ZUCKERBROD:  I am here and I have been retained to

represent the New York Post Publishing, Inc.

          THE COURT:  All right.  Thank you.

          Let's then proceed with the consideration of the

plaintiff's request.

          For the plaintiff?

          MS. HANDMAN:  Your Honor, this is Laura Handman, Davis

Wright Tremaine.  I am here with my colleague Sam Bayard and

assorted counsel in the back there, including Ginny Gavenchak,

the senior vice president and deputy general counsel of News

1  Corporation.

2        I represent NYP Holdings, which is the publisher of

3  the New York Post.  The New York Post has been published under

4  that name since 1934 and has been on the Web site since 1996

5  under that name.  NYP Holdings is the owner of a family of

6  registered New York Post trademarks for newspapers, online

7  content, mobile devices, and various and sundry other items.

8  Seven of those marks have become incontestable.

9        Defendant says, You know we are the New York Post

10  Publishing, Inc., and Steven Hoffenberg, the owner, CEO, and

11  publisher; and they launched in September a competing news Web

12  site, New York Post Publishing, Inc., and have announced plans

13  that were to begin this month, actually, to print newspapers

14  under that same name.

15        If I could just briefly review the history of some 20

16  years ago:

17        Mr. Hoffenberg was the publisher of the New York Post

18  for less than three months in 1993.  He was at that time hoping

19  to buy the New York Post, but that never happened because the

20  SEC froze the assets of his company, Towers Financial.

21        NYP Holdings, in September of that year, acquired

22  from New York Post Company all of the assets, including the

23  trademarks; and the bankruptcy court, in September of 1993,

24  also ordered and confirmed that purchase free and clear of all

25  liens and encumbrances.  We have attached in our reply the

6

asset purchase agreement that makes that clear as well as

the -- we cited the bankruptcy court docket where that order

can be found.  It is docket number 224.  We have requested the

actual order, and we still have not received that.

But other than Mr. Hoffenberg's say-so, there is not

one document to support that he owns the New York Post

trademarks, as he claims.  And even if he did, that would

not -- he has not used them, not he, not Towers Financial, not

New York Publishing Company, Inc., has used those marks at all

until just a month ago.  So whatever rights he might have had,

he has not used them, and that is the quintessential part of

trademark.

The fact that he has a company called New York Post

Publishing Co., that's a trade name.  That signifies a

business.  That's not the same as trademarks, which are

determined by use in connection with goods and services.

As to that, NYP Holdings and its predecessors have

been using the New York Post marks since, as I said, 1934.  So

that's a prior use that trumps any subsequent use.  New York

Post Publishing company, which was formed in that window of

time that Mr. Hoffenberg was publisher, has never used that

name as a trademark until just in September.  So, if anything,

he is a junior infringing newcomer.

My client first learned of the intent to -- the New

York Post Publishing Company was formed in 1993, but it ceased

eav2nypa

1    to exist in 1995 and lay dormant until just June of this year.

2    We learned that Mr. Hoffenberg intended to reactivate that

3    company when a lawyer contacted NYP Holdings and said, We are

4    planning to reactivate the company and if you have any papers,

5    please serve me, anticipating that, indeed, we would be in

6    court today if they reactivated the company.

7         We sent promptly a cease-and-desist letter advising

8    them that any use of New York Post Publishing Company would

9    infringe our trademarks, that we would bring an action to

10   prevent that, and that's indeed what we did on October 16.

11        The fact that he was able to form a company, as I

12   said, does not give you rights to use it as a trademark.  We

13   have many authorities that we cited in our opening brief to

14   that effect.  One case that we pointed out in our reply that I

15   think is particularly pertinent that Judge Cote decided and

16   granted an injunction, that was the DeBeers –– the defendant

17   there had formed a company called DeBeers Diamond Syndicate.

18   It went dormant for 15 years, just as here, never used that as

19   a trade name.  Then he reactivated it, decided to start selling

20   diamonds on the Internet.

21        Needless to say, the very iconic mark of DeBeers

22   that's associated with diamonds brought a trademark

23   infringement action for that use.  The court said, first of

24   all, the inactivity, the nonuse, you have abandoned whatever

25   rights you had.  Secondly, the mere fact that you have a

eav2nypa

1  company by that name doesn't give you a trademark, and the

2  addition of names like "diamond" to the word "DeBeers" only

3  makes it worse, since you are both in the same exact competing

4  business.

5         That's exactly what we have here.  On this Web site

6  you have New York Post in big words, big black letters, and

7  "Publishing, Inc." in small purple script.  Even if it didn't

8  have "Publishing, Inc.," it would be a trademark violation.

9  But the addition only makes it worse, since we are both in the

10  publishing business.

11         Then there are additional things on the site that add

12  to that.  There is a big feature that says "History of the New

13  York Post, Future of the New York Post."  In press releases

14  Mr. Hoffenberg has said he is once again becoming the

15  publisher, referring back to the two months plus that he was

16  publisher of the New York Post in 1983.

17         It is further compounded by a cover of the New York

18  Post that's on the Web site and, indeed, was submitted with the

19  papers to your Honor, that says Hoffenberg saves The Post, and

20  it is a mockup of the New York Post.  Well, that's a fake

21  cover.  In fact, The Post cover said "Last Minute Deal Saves

22  The Post.  Never say die."  But this cover of the post is right

23  on the Web site and has all the other indicia of the New York

24  Post on it.

25         In addition, they claim the lineage of the New York

1  Post, tracing back New York publishing -- Post Publishing,

2  Inc., to all the way back to Alexander Hamilton, which is,

3  indeed, the lineage of the paper, but not of New York Post

4  Publishing, Inc.

5  All of this establishes the likelihood of confusion

6  and, indeed, Mr. Hoffenberg has not really challenged in any

7  way the likelihood of confusion. In fact, he embraces it. He

8  says he owns the New York Post. He claims all of this and

9  embraces it, doesn't say, oh, yeah, readers will be able to

10  discern the difference. And the readers here -- and these are

11  all the *Polaroid* factors that I might say are met here in

12  spades. The readers here are not the sophisticated diamond

13  purchasers in the diamond case where Judge Cote found for the

14  plaintiffs. This is readers who go to the newsstand, surf the

15  web, and say, oh, New York Post. And the look and feel of the

16  cite is very similar to ours as well.

17  So we think that the likelihood of confusion here is

18  extremely strong and it is compounded by the fact of bad faith.

19  Because, as I said, first of all, the marks are iconic.

20  Everyone knows the New York Post, but particularly

21  Mr. Hoffenberg, who was the publisher for three months. And to

22  the extent there was any doubt, that was put to rest by the

23  cease-and-desist letter that he received in June of this year,

24  which he ignored and nonetheless went ahead and put up his New

25  York Post Publishing Company, Inc., Web site.

eav2nypa

1          In addition to the -- if you look at the Web site, it

2     is harmful and dilutes the New York Post brand because (a) it

3     is of inferior quality.  There is no original reporting.  It is

4     hasty rewrites and syndicated columns, not original reporting.

5     But beyond that, it associates the New York Post with the

6     serious criminal history that Mr. Hoffenberg has and associates

7     it with such things as the dubious offer of $1 million to

8     anyone that comes up with a great scandal; that, coming from

9     someone who owes $476 million in restitution to the victims of

10    his fraud, makes it particularly questionable.

11         It also raises the question of whether Mr. Hoffenberg

12    would be able to pay damages or the New York Post Publishing

13    Company would be able to pay damages, which makes the

14    inadequacy of the damage remedy patent and the irreparable

15    harm, the continuing irreparable harm to the New York Post that

16    much more compelling, and the need for an injunction, immediate

17    injunction, very warranted indeed.

18         So we believe we have a strong likelihood of success,

19    indeed, I would say an overwhelming likelihood of success,

20    irreparable harm, the balance of hardships are clearly in our

21    favor, particularly because Mr. Hoffenberg decided to go ahead

22    despite being on notice and actually inviting a lawsuit, which

23    is indeed what he got.

24         I would say one other point.  If your Honor does grant

25    an order forbidding -- ordering him to cease and desist

1    using newyorkpostpublishing.com, both as the trademark and as

2    the domain name, and we would ask also any -- there are many

3    representations that are being made about owning the New York

4    Post, being the New York Post, affiliated, becoming the

5    publisher of the New York Post.  All of those, any use of the

6    New York Post marks in that way were also ordered to be ceased

7    and ordered to third parties, such as the Web host and domain

8    name, that they cease providing hosting services.  Because what

9    happened here, when we noticed that the Web site was up, we

10   immediately sent a letter to the host and domain name registrar

11   asking them to take it down and the site was disabled, and then

12   apparently it was put back up notwithstanding, and that's when

13   we filed this action.  So we would hope that those folks, once

14   they get a notice of this order, would also cease providing

15   those services so that the confusion to the public does not

16   persist and the harm to the post is mollified.

17           And I would say one last point on the U.S. Attorney.

18   I did reach out to them, and they have confirmed to me and have

19   said that I could represent to you that they don't intend to

20   intervene, which is consistent with your Honor's ruling on

21   that.

22           THE COURT:  Thank you.

23           Mr. Hoffenberg.

24           MR. HOFFENBERG:  Good morning, your Honor.

25           THE COURT:  You are appearing on your own behalf in

eav2nypa

1    this matter.

2           MR. HOFFENBERG:  Yes, I am, sir.  I am the defendant

3    as well as New York Post Publishing, and I have asked counsel

4    for New York Post Publishing, Inc., to accept my arguments as

5    his arguments.

6           It has been interesting to hear what was said this

7    morning about the history of the New York Post and Hoffenberg

8    the defendant.  None of it is true on the basis of the New York

9    Post transactions between Hoffenberg and Rupert Murdoch

10   personally, who is News Corporation's controlling shareholder.

11          The first question that I would like to make a record

12   of, I don't think this court has jurisdiction.  This is a

13   bankruptcy case that is being relitigated under a trademark

14   question that was settled in the bankruptcy court.  Counsel for

15   the plaintiff does not articulate one point about the standing

16   order right in the counsel's Exhibit B in the filed reply where

17   counsel for the plaintiff concedes that the defendant has the

18   borrowing agreement for the trademark liens and control of the

19   trademarks.  It is right here, your Honor.  The defendant has

20   the liens and control of the New York Post trademarks.

21          Counsel does not address it, does not bring it to the

22   court's attention.  It was granted in the bankruptcy court, it

23   is not part of plaintiff's papers, and it is ridiculous.  It

24   has never been satisfied, it has never been completed, and it

25   is an issue that belongs in the bankruptcy court for

eav2nypa

1 determination first before it gets to this court, which is the

2 appeals court for the bankruptcy court. I have no idea why we

3 are here this morning. We belong in the bankruptcy court, your

4 Honor.

5 I have a bankruptcy court order here from Towers

6 Financial Corporation showing that items are open. I will be

7 delighted to hand it to plaintiff's counsel and to the court if

8 I may, sir.

9 May I do that?

10 THE COURT: You may submit anything you wish to

11 submit.

12 MR. HOFFENBERG: Thank you, sir.

13 This is a court order with Towers Financial

14 Corporation concluding hearing a final decree, page 4. It

15 should be your attention where the judge says there are

16 substantial open assets in my name that have never been

17 concluded. May I submit this, Judge, Exhibit 1?

18 THE COURT: Give it to the clerk.

19 MR. HOFFENBERG: Thank you.

20 Your Honor, plaintiff files a declaration of Samuel M.

21 Bayard, counsel at the table in front of the court, Exhibit B.

22 Exhibit B is the entire docket of the New York Post bankruptcy

23 proceedings that Rupert Murdoch was prohibited in participating

24 in as well as News Corporation because there was a course

25 ownership prohibition for News Corporation to be involved in

eav2nypa

1    the New York Post, and they could not have standing, your

2    Honor, and that's why Rupert Murdoch asked the defendant

3    Hoffenberg to front, be his partner, and save the New York Post

4    at a cost of $100 million to the defendant's holdings,

5    towersinvestors.com, 200,000 restitution victims that plaintiff

6    makes light of as if it doesn't matter, the restitution order.

7             Plaintiff says she spoke to the U.S. Attorney who says

8    they are not going to appear.  They don't have a choice, your

9    Honor.  They have to appear.  It is a statute.  They have to

10   represent the restitution victims under the fund's Victims Act.

11   This is absurd what I am hearing, your Honor, a complete

12   injustice and miscarriage of law.

13            Forgive me, your Honor, for being passionate about

14   this, but this is the restitution of 200,000

15   towersinvestors.com victims that plaintiff is damaging this

16   morning with misinformation and fabricated stories to this

17   court.

18            Docket 13 and 14 of Plaintiff's Exhibit B is the

19   docket of the bankruptcy court for the New York Post.  The

20   borrowing order is clearly ordered there from me, that I got in

21   the bankruptcy court for the New York Post.  Nowhere does

22   plaintiff's counsel make one word mention of that, and I told

23   them ten times and I told them --

24            THE COURT:  Let me ask a question please.

25            The document you have just handed up contains numerous

eav2nypa

1    handwriting additions and comments.  Were those in the original

2    of this order?

3            MR. HOFFENBERG:  The last page is the judge's

4    writings, your Honor.

5            THE COURT:  I am not talking about the last page.  I

6    am talking about the first page which has some block letter

7    writing on top and --

8            MR. HOFFENBERG:  The top page.

9            THE COURT:  And the last page contains some block

10    letter writing in apparently the same handwriting and it has a

11    line that purports to say "by Judge below."

12            MS. HANDMAN:  That is my writing, your Honor, and the

13    judge's writing is the smaller letters in script in the

14    pleading.  Mine is printed.  The judge is not printed.  And the

15    judge's writing on page 1 appears in the second paragraph and

16    at the bottom of the page, right under the date stamp for

17    December 29, 1999, Judge, on page 1.

18            On page 2 the judge's writing appears at the bottom of

19    the page.

20            THE COURT:  I do not understand why, if you were going

21    to submit a document for this court's consideration, would you

22    not submit the original without this substantial amount of

23    alteration that makes it unclear exactly what the original

24    purports to say.

25            Be that as it may, proceed.

eav2nypa

1          MR. HOFFENBERG:  Your Honor, the defendant Hoffenberg

2     is *pro se*.  Therein, the defendant Hoffenberg has limited

3     access to the transcripts of the Towers Financial Corporation

4     final order that's in storage in Missouri.  Said documents will

5     be produced in front of this court in actual filed copy by

6     Judge Abrams.  We are doing that, your Honor.  We just need a

7     little bit more time.  This was an expedited proceeding order

8     to be completed in pleading form within days, not weeks, days.

9          I called counsel for the plaintiff.  I said, you know,

10    we have to get documents that's in storage, as they said they

11    have to get documents that's in storage.  We both have to get

12    documents that are in storage in Missouri in the bankruptcy

13    case of the New York Post.  That's what we are relitigating

14    here today, what occurred in 1993.  Wherein the docket sheet is

15    explicit that the New York Post liens of all trademarks belong

16    to the defendant.  They can't show your Honor on this docket

17    sheet their Exhibit B how they own it because they don't.  They

18    do not own it.  The defendant owns it.  But they don't want to

19    talk about that, your Honor.  Why bother?  It is only the

20    truth.  This is a fabricated set of pleadings that's a smoke

21    screen for Rupert Murdoch, the controlling shareholder of News

22    Corporation, who has done this in courtroom after courtroom

23    after courtroom all over the world, where he sends in good

24    folks, as these lawyers are good folks, who never spoke to

25    Rupert Murdoch, never interviewed him, and have no

understanding of my agreement with Rupert Murdoch in 1993.
None at all. All they are doing is filing voluminous papers
that do not justify what the court docket says. The defendant
controls the trademarks. It says so on their exhibit, your
Honor. It is right here. It is their exhibit.

I came to them before the session started, your Honor,
I said, Let's go have a conference. Let me show you that your
pleadings are frivolous, because I know you didn't conference
with Rupert Murdoch. They refused to meet with me. They
wanted to take up the court's time and waste your time.

Here is the docket sheet. They don't control the
trademarks. The defendant does. They don't have a court
docket showing relief from this order of the bankruptcy court
for the New York Post. They produced a transfer agreement
signed by Stephen Bumbaca, a man that pled guilty for fraud for
signing it. He is the man who pled guilty in the New York Post
proceedings for tax fraud, for evasion of financial fraud, and
he went to federal prison. That's the exhibit they produced as
the controlling exhibit for the transfer of the trademark.
That man can't even testify to the validity of his signature.
He was a criminal when that occurred. He was committing crimes
when that occurred.

In addition, they include a document here that's
outrageous showing how they filed it by Squadron Ellenoff.
That's the defendant's counsel, not their counsel. That's an

eav2nypa

1  amazing conflict of interest.  He is the appearing counsel for

2  the defendant in the bankruptcy court.  They include that as

3  their controlling document for filing this purported trademark.

4  That belongs to the defendant.  It is the defendant's counsel's

5  filing.  How can it possibly be theirs when it is the

6  defendant's law firm that filed the trademark in question?  It

7  is unbelievable.  What we are doing here?  I don't quite

8  understand.  I will give you that exhibit so that it is clear,

9  your Honor.  I mean it is just incredible what they have done

10  here.  Incredible.

11          If you will bear with me for one second.

12          There it is.  Exhibit B, supplemental declaration of

13  Eugenia -- I am pronouncing it wrong.  For give me.  I will

14  call her Ms. Gavenchak, senior vice president of News Corp.  I

15  am sure she is in the room someplace.  Is she here?  Are one of

16  you Ms. Gavenchak?  No.  Are you Ms. Gavenchak?

17          MS. HANDMAN:  Mr. Hoffenberg --

18          THE COURT:  Mr. Hoffenberg, please address the court.

19          MR. HOFFENBERG:  Forgive me.  I just wanted to make

20  sure she is here.  This is her affidavit.

21          She submits this supplemental declaration showing the

22  defendant's counsel filing their supposed trademark.  How could

23  that be?  This is the counsel for the defendant, not the

24  plaintiff.  It can't be their trademark.  He is the wrong

25  lawyer.  He doesn't represent them.  He represents the

1   defendant -- this is ridiculous -- Squadron Ellenoff & Plesent,

2   in this proceeding of the trademarks that's being relitigated

3   in this courtroom represented the defendant.  Now he represents

4   the plaintiff.  That's amazing, totally amazing.  And now they

5   want credit, your Honor, for defendant's counsel filing a

6   trademark that they claim they control when the court record

7   says the defendant controls it.

8          Why are we here your Honor?  Let us go to the

9   bankruptcy court and straighten this out or let us do

10  mediation.  This is a document case, your Honor, for the

11  bankruptcy records.  These people are honest people, but they

12  never interviewed Rupert Murdoch who made the deal with the

13  defendant Hoffenberg.  They have no idea of this case in 1993.

14  And the lawyer from News Corp. that's in the audience, she has

15  no clue what happened in 1993, none at all.  So she brings them

16  into this courtroom and makes up this cock-and-bull story that

17  these documents belong to Rupert Murdoch when they don't.  They

18  belong to the defendant.

19         It is impossible for them to bring this claim,

20  impossible.  The money lien agreement is here, docket 13 and 14

21  in their exhibit.  It is right here, your Honor.  It is right

22  here.  It is their exhibit, Exhibit B, Exhibit -- let me get

23  you the docket for the bankruptcy to -- forgive me for one

24  second, your Honor.  The bankruptcy entire docket is in the

25  declaration of Samuel M. Bayard.  It is docket B, the whole

eav2nypa

1  docket.  They can't justify one claim they articulated in front

2  of this court, not one, because the defendant controls the

3  trademarks, not Rupert Murdoch.  It says so right here.

4              THE COURT:  Thank you, Mr. Hoffenberg.  You don't have

5  to repeat yourself.

6              MR. HOFFENBERG:  Thank you, sir.  Thank you, sir.

7              THE COURT:  Mr. Zuckerbrod, do you wish to address the

8  defendant New York Post Publishing, Inc., claims?

9              MR. ZUCKERBROD:  Your Honor, I was only retained

10  yesterday.  I have not had an opportunity to review the

11  pleadings.

12              THE COURT:  Thank you.

13              Ms. Handman.

14              MS. HANDMAN:  Yes, your Honor.  Just a few points.

15              That document that Mr. Hoffenberg refers to, docket

16  item 224, very expressly says there was an order signed 9/14/93

17  granting motion approving and authorizing the debtor,

18  that's New York Post Company, to enter into an asset purchase

19  agreement with NYP Holdings, Inc., for the sale of assets to

20  NYP free and clear of all liens, claims, interest, and

21  encumbrances.  And if you look at the asset agreement itself,

22  it says that the assumed liabilities exclude any debts owed to

23  Towers Financial and that there is an escrow account that is

24  meant to cover the Towers Financial debt.  And Mr. Hoffenberg

25  has presented nothing that suggests that there was a lien that

1    was ever enforced or foreclosed on, nothing.  So that same

2    docket has exactly the evidence of where we stand and there is

3    no need to go back to the bankruptcy court.  It is clear.  And

4    that has been the business of operation since 1993 when this

5    deal was signed and approved by the bankruptcy court.

6         Mr. Hoffenberg's -- this document which we have just

7    seen for the first time and have not read, but it involves

8    Towers Financial bankruptcy.  Indeed, the handwritten language

9    that Mr. Hoffenberg represents is the court's says that his

10    presence is not necessary and that the alleged assets are not

11    the property of the estate and have already been fully

12    administered and that the presence of Mr. Hoffenberg before

13    this court would be of no assistance and is unnecessary.  At

14    that point in time, Mr. Hoffenberg was in federal prison and I

15    presume that was why that was mentioned.

16         As to any agreement between Mr. Hoffenberg and

17    Mr. Murdoch, Mr. Hoffenberg throughout has said that and never

18    produced one single document to support any such agreement.  We

19    have absolutely no reason to believe that such an agreement

20    exists.  In any event, it was the asset purchase agreement is

21    what controls, and that was in September of 1993.

22         And I have to go back to the basic thing, that we are

23    here on a trademark infringement claim.  The use of the

24    trademark is what matters.  The use has been by NYP Holdings

25    and its predecessor for decades.  New York Post Publishing,

eav2nypa

1   Inc., has no right to put up an infringing, confusing Web site

2   that makes use of New York Post trademark, and that is what we

3   are here for, not to relitigate fantasies about the past, but

4   to look at what we are here for now.  And I will say the

5   assignment was filed -- of the trademark from New York Post

6   Company to NYP Holdings was filed in the trademark registry,

7   and that's the exhibit that we also attached to our reply.

8           Do you have any questions, your Honor?

9           THE COURT:  No, no further questions.  Thank you.

10          I am going to close this proceeding.

11          Upon review of the record that has been submitted by

12  the parties and the arguments and other material presented in

13  this hearing this morning, I find that the plaintiffs have made

14  a compelling case that entitles them to injunctive relief.  I

15  find that they have made a case for irreparable harm and the

16  likelihood of success on the Lanham Act and trademark claims as

17  well as the cyber piracy claims and the other trademark

18  infringement claims that they have submitted in their papers.

19          I find that the *Polaroid* factors here all weigh in

20  favor of a determination of likelihood of confusion.  I am

21  persuaded that there is sufficient showing as well of bad faith

22  on this record and that the balance of hardships weigh in favor

23  of the plaintiff.

24          I, therefore, will issue a cease-and-desist order

25  directing the defendant to cease using the New York Post

eav2nypa

1    trademark and domain name, and I will direct the plaintiff to

2    prepare an appropriate order memorializing the court's

3    determination this morning.

4           A full ruling setting forth the court's reasoning and

5    findings will issue shortly.

6           I thank you.  Have a good day and good weekend.

7           MR. HOFFENBERG:  May I?

8           THE COURT:  Yes, Mr. Hoffenberg.

9           MR. HOFFENBERG:  Thank you, your Honor.

10          The name New York Post Publishing, Inc., is a

11   corporation that I have owned since 1993.  I respect the

12   court's order this morning, but I don't believe the court is

13   saying that that name doesn't belong to me.  I think you are

14   recognizing that I own the corporation and you are only asking

15   me not to use that name as a presentation in confusion with the

16   other New York Post, which I am willing to understand and

17   interpret clearly.  But you are not saying that I am prohibited

18   in free speech of saying that I own New York Post Publishing,

19   Inc., are you, Judge?

20          THE COURT:  The order will make clear exactly what the

21   court is saying.  You cannot use that name in violation of the

22   Lanham Act.  That is the bottom line.

23          Thank you.

24          MR. HOFFENBERG:  Thank you, sir.

25                              - - -